## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1.  ROWAN FOWLER; | |
| 2.  ALLISTER HALL; and | |
| 3.  C.R., | |
| *Plaintiffs*, | |
| v. | |
| 1.  KEVIN STITT, in his official capacity as Governor of the State of Oklahoma; | Case No.:  22-CV-00115-GKF-SH |
| 2.  KEITH REED, in his official capacity as Commissioner of Health for the Oklahoma State Department of Health; and | |
| 3.  KELLY BAKER, in her official capacity as State Registrar of Vital Records, | |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiffs are transgender people born in Oklahoma who wish to correct their respective Oklahoma birth certificates to accurately reflect their sex, consistent with their gender identity.  They also seek access to birth certificates that they can use without the involuntary disclosure of their transgender status, which can expose them to discrimination, harassment, and violence.

2.      Possessing accurate identity documents that are consistent with a person's gender identity—which represents a person's core internal sense of their own gender—is essential to a person's basic social, economic, physical, and mental well-being.  A birth certificate is a critical

and ubiquitous identity document used in many settings to verify a person's identity.  Access to employment, education, housing, health care, voting, banking, credit, travel, and many government services all hinge on having appropriate and accurate personal documentation that reflects a person's true identity.  Birth certificates are also often used to obtain other essential identity documents, such as driver's licenses and passports.

3.      While others born in Oklahoma have access to an accurate birth certificate matching their gender identity, transgender people are barred from obtaining an accurate birth certificate matching their gender identity.  Oklahoma's refusal to issue such birth certificates erects a barrier to the full recognition, participation, and inclusion of transgender people in society. Indeed, few things are as essential to personhood and regular interaction in the world as being able to accurately present a person's identity to those with whom they come into contact.

4.      Until recently, the State of Oklahoma allowed transgender people to correct the sex designation on their birth certificates, also known as a gender marker, to match their gender identity.  That abruptly changed, however, after the Governor banned such corrections in late 2021, overriding the long-standing practice of Oklahoma state officials responsible for vital statistics and in conflict with state court orders directing gender marker corrections.  Oklahoma's current bar not only stands in sharp contrast to its own prior practice but also the approach of nearly all other states and the District of Columbia, which generally have established processes by which transgender people can change the gender markers on their birth certificates.  Indeed, the Governor's bar is also inconsistent with Oklahoma's current practice of permitting transgender people to change sex designations on their driver's licenses and other identifying documents to match their gender identity.

5.      Oklahoma's current practice with respect to birth certificates, which each Defendant enforces, violates federal constitutional guarantees, including the rights to equal protection, due process, and freedom from compelled speech.   As confirmed by Oklahoma's prior practice, the practices of other states, and Oklahoma's current practice with respect to driver's licenses and other identifying documents, there is no governmental justification to support Oklahoma's refusal to provide transgender people with accurate birth certificates matching their gender identity and without disclosure of their transgender status.

## JURISDICTION AND VENUE

6.      This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

7.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and the Constitution of the United States.

8.      Venue is proper in the Northern District of Oklahoma under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the district.

9.      This Court has the authority to enter a declaratory judgment and to provide injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

10.      This Court has personal jurisdiction over Defendants because they are domiciled in Oklahoma and because their refusal to provide Plaintiffs with an accurate birth certificate matching their gender identity occurred within Oklahoma.

## PARTIES

### A.   Plaintiffs

11.     Plaintiff Rowan Fowler is a transgender woman who was born in Oklahoma and who currently resides in Oklahoma.  Ms. Fowler wishes to correct her Oklahoma birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female, consistent with her female gender identity.

12.     Plaintiff Allister Hall is a transgender man who was born in Oklahoma and who currently resides in Oklahoma.  Mr. Hall wishes to correct his Oklahoma birth certificate, which currently indicates that his sex is female, to accurately reflect his sex as male, consistent with his male gender identity.

13.     Plaintiff C.R. is a transgender man who was born in Oklahoma and who currently resides in Oklahoma.  C.R. wishes to correct his Oklahoma birth certificate, which currently indicates that his sex is female, to accurately reflect his sex as male, consistent with his male gender identity.

### B.   Defendants

14.     Defendant Kevin Stitt ("Governor Stitt") is the Governor of the State of Oklahoma. Governor Stitt has taken actions under color of state law to prevent transgender people from accessing Oklahoma birth certificates matching their gender identity, including through the issuance of an Executive Order as described further below.  Governor Stitt oversees the Oklahoma State Department of Health ("OSDH"), including its Commissioner of Public Health.

15.     Defendant Keith Reed ("Mr. Reed") is the Commissioner of Health for OSDH.  Mr. Reed supervises the activities of OSDH, enforces Oklahoma's vital statistics laws, and maintains

and operates Oklahoma's system of vital statistics. Mr. Reed's administration and enforcement of the vital statistics laws are actions under color of state law.

16.     Defendant Kelly Baker ("Ms. Baker") is the State Registrar of Vital Records. In her role as the Registrar, Ms. Baker is the official custodian of the vital records of the state, and she also enforces Oklahoma's vital statistics laws.  Ms. Baker exercises authority over the issuance and alteration of Oklahoma birth certificates.  Ms. Baker's administration and enforcement of the vital statistics laws are actions under color of state law.

## STATEMENT OF FACTS

### A.     Sex, Gender Identity, and Gender Dysphoria

17.     A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity.  These characteristics may not always be aligned.

18.     The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth.  Typically, a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth.  Other sex-related characteristics (such as a person's chromosomal makeup, hormones, or gender identity, for example) are typically not assessed or considered at the time of birth.

19.     External reproductive organs alone are not determinative of a person's sex and can be in conflict with a person's own gender identity.

20.     Instead, gender identity—a person's core internal sense of their own gender—is the primary determinant of a person's sex.  Every person has a gender identity, whether they are transgender or not, and that gender identity is *the* critical determinant of a person's sex, including for transgender people whose sex-related characteristics are not in typical alignment.

21.     Gender identity and transgender status are thus inextricably linked to a person's sex and are sex-related characteristics.

22.     For the majority of people, their sex assigned at birth conforms with their gender identity.  That is not the case, however, for transgender people.

23.      Transgender persons are people whose gender identity diverges from the sex they were assigned at birth.  A transgender man's sex is male (even though he was assigned the sex of female at birth), and a transgender woman's sex is female (even though she was assigned the sex of male at birth).

24.     There is a medical consensus that gender identity is innate, has biological underpinnings (including sexual differentiation in the brain), and is fixed at an early age.  As such, efforts to change a person's gender identity are unethical and harmful to a person's health, dignity, and well-being.

25.     Attempts to change a person's gender identity to bring it into alignment with the person's sex assigned at birth are not only unsuccessful but also dangerous, risking psychological and physical harm, including suicide.

26.     Living in a manner consistent with a person's gender identity is critical to the health and well-being of all transgender people.

27.     Likewise, the refusal to treat a person in a manner consistent with their gender identity is harmful to that person's dignity and well-being.

28.     The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria.  Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth.  Treatment for gender dysphoria is governed by internationally recognized

standards of care.  If left untreated, gender dysphoria may result in serious consequences including depression, self-harm, and even suicide.

29.     Living in a manner consistent with a person's gender identity is not only critical to the health and well-being of all transgender people, but it is also a key aspect of treatment for gender dysphoria.

30.     The process by which transgender people come to live in a manner consistent with their gender identity, rather than their sex assigned at birth, is known as transition. The steps that transgender people take to transition, as well as to treat their gender dysphoria, vary with the needs of each person, but these steps generally include one or more of the following: (1) social transition; (2) hormone therapy; and/or (3) gender-affirming surgery.

31.     Social transition entails a transgender person living in a manner consistent with the person's gender identity.  For example, for a transgender man, social transition may include, among other things, changing his first name to a name typically associated with men; using male pronouns; changing his identity documents to indicate his male gender; wearing clothing and adopting grooming habits typically associated with men; and otherwise living as a man in all aspects of life.

32.     Social transition is thus an important aspect of transition for a transgender person. Social transition represents an important part of a transgender person's ability to appear and act in a manner consistent with their gender identity, regardless of their physical characteristics.

33.     Medical transition, a critical part of transitioning for many transgender people, includes treatments that bring the sex-specific characteristics of a transgender person's body into alignment with their gender identity, such as hormone replacement therapy or surgical care.

34.     Whether medical transition is necessary or appropriate depends on a person's particularized needs and health.  A person's ability to access treatment—especially gender affirming surgery—may be limited by financial resources, insurance coverage, provider availability, and other barriers to health care. Like any other health care decision, undergoing either hormone replacement therapy or surgical care, is a profoundly personal decision, done in consultation with medical professionals.

35.     The various components associated with transition—social transition, hormone replacement therapy, or surgical care—do not change a person's sex, but instead bring a person's physical appearance and lived experience into better alignment with their sex, as determined by their gender identity.

36.     Because living in a manner consistent with a person's gender identity is critical to the health and well-being of transgender people, being able to possess identity documents consistent with a person's gender identity is also necessary for a person's optimal physical and mental health and well-being.

37.     Thus, depriving transgender people of birth certificates that match their gender identity harms their health and well-being.  This deprivation also interferes with the international and accepted standard of care for gender dysphoria by impeding a transgender person's ability to live in a manner consistent with their gender identity, and can seriously aggravate the negative consequences for transgender people experiencing gender dysphoria.

**B.**     **The Need for Accurate Birth Certificates Matching a Person's Gender Identity**

38.     A birth certificate is more than a piece of paper.  It reflects government recognition of a person's gender—just as a marriage certificate reflects government recognition of a person's relationship.  The government's refusal to provide transgender people with birth certificates

matching their gender identity is a stigmatizing refusal to acknowledge their gender that deprives them of their equal dignity.

39.     A person's birth certificate is a trusted and essential government-issued document that serves as proof of a person's identity.  For this reason, the government makes a copy of a birth certificate available to the person reflected on the birth certificate, rather than merely reserving it for the government's own use.

40.     The use of birth certificates to demonstrate identity is ubiquitous in our society. Birth certificates are commonly used in a wide variety of contexts and are one of the primary ways of proving age and citizenship.  In the ordinary course of life, a birth certificate is often relied upon by employers and educational institutions for enrollment.   It can also serve as the foundation to securing other important identity documents (such as driver's licenses, state identification cards, social security cards, voter registration cards, passports, and other state and federal identification documents). For example, the Oklahoma Department of Public Safety frequently relies on birth certificates in issuing or renewing state issued identification and driver's licenses.

41.     Because of these and other instances in which a birth certificate serves as proof of identity or citizenship, every person needs a birth certificate that accurately reflects their identity. However, transgender people born in Oklahoma, unlike other people born in Oklahoma, are now denied the ability to obtain an accurate birth certificate.

42.     The sex designation originally placed on a transgender person's birth certificate is inaccurate because it is based on visual assumptions about that person's sex made at the time of their birth, without taking into consideration any other relevant considerations that determine a person's sex, including, most importantly, gender identity.

43.     Depriving transgender people of birth certificates that accurately reflect their sex, consistent with their gender identity, forcibly discloses private and sensitive information about them in contexts where it would otherwise remain undisclosed (such as when seeking employment), regardless of whether a person's transgender status may otherwise be known by others (for example, by friends or family), and regardless of a person's desire not to disclose that personal information.

44.     Transgender people denied an accurate birth certificate are thus deprived of significant control over the circumstances surrounding disclosure of their transgender status, including when, where, how, and to whom their transgender status is disclosed.

45.     Being compelled to present a birth certificate that inaccurately reflects a transgender person's sex exposes that person to serious invasions of privacy.  A person's transgender status (and medical diagnosis of gender dysphoria) constitutes deeply personal and sensitive information over which a transgender person has a reasonable expectation of privacy, and the disclosure of which can jeopardize a person's safety and risk bodily harm.

46.     As a result of being forced to use identity documents that are inconsistent with who they are, transgender people experience high rates of discrimination (including being denied service or asked to leave public accommodations, workplaces, or housing), harassment, and violence.  A national survey conducted by the National Center for Transgender Equality in 2015 revealed that nearly one third of respondents who had shown an identity document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.  The lack of access to accurate identity documents can be a barrier to the full and safe engagement of transgender people in society and deter them from equal participation in public life.

47.     More generally, transgender people experience substantial discrimination and harassment in a wide variety of contexts, including with respect to employment, education, public accommodations, health care, housing, and interactions with the government, including law enforcement.  Transgender people are also disproportionately targeted for hate crimes.  These realities make the involuntary disclosure of a person's transgender status particularly harmful and dangerous.

48.     Furthermore, denying transgender people accurate birth certificates, consistent with their gender identity, undermines rather than serves the purpose of verifying that a transgender person is, in fact, the same person reflected on that person's birth certificate.  For example, a transgender woman who has taken steps to bring her body and lived experience into alignment with her gender identity may correctly be perceived as female by others.  But a birth certificate with a male gender marker conflicts with her gender identity, causing others to question whether she is the same person reflected on the birth certificate, and exposing her to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence.

## C.     **Oklahoma's Birth Certificate Policy**

49.     OSDH exercises responsibility for issuing and changing Oklahoma birth certificates.  Each of the Defendants enforces a policy and practice of refusing to provide transgender people with birth certificates that match their gender identity (the "Birth Certificate Policy").  That includes the refusal to correct the gender markers on transgender people's birth certificates to match their gender identity.  The Birth Certificate Policy challenged here also includes the refusal to provide a birth certificate matching a transgender person's gender identity without the mandatory inclusion of revision history that discloses a person's transgender status, such as a person's sex assigned at birth and former name associated with that assigned sex.

11

50.     Defendants' refusal to permit transgender people to correct the gender markers on their birth certificates to match their gender identity represents a complete reversal of OSDH's prior practice.  For several years, from at least 2007 if not earlier, through most of 2021, OSDH allowed transgender people to correct the gender markers on their birth certificates to match their gender identity.  Upon information and belief, the OSDH officials who oversaw that practice, including Defendant Baker as Registrar, believed that doing so was consistent with their responsibility to protect the integrity and accuracy of Oklahoma's vital records.  Since 2018 alone, OSDH has corrected the gender markers on the birth certificates of more than one hundred transgender people to match their gender identity, without any harm to others.

51.     There is no Oklahoma statute categorically prohibiting OSDH from changing the gender marker on people's birth certificates to match their gender identity.  The general statute addressing amendment of certificates, 63 Okla. Stat. § 1-321, provides that certificates may be amended in accordance with the statutory scheme and regulations regarding vital statistics to protect the integrity and accuracy of vital statistics records.  For several years, and at least prior to the Governor's Executive Order discussed below, state courts in Oklahoma and elsewhere have issued orders directing that the birth certificates of transgender people born in Oklahoma be corrected to match their gender identity.  In response to those orders, OSDH amended transgender people's Oklahoma birth certificates to match their gender identity.

52.     The current Birth Certificate Policy originates in part from actions taken by Governor Stitt in response to the resolution of litigation involving OSDH officials.  In 2021, then-Commissioner of Health Lance Frye and other OSDH officials entered into a settlement that enabled a plaintiff, whose gender identity did not match their sex assigned at birth, to obtain an

amended Oklahoma birth certificate with a gender-neutral designation, consistent with their gender identity.

53.     In response to the settlement, Governor Stitt issued a statement on October 21, 2021, in which he stated, "I believe that people are created by God to be male or female.  Period." He further stated, "There is no such thing as non-binary sex, and I wholeheartedly condemn the OSDH court settlement that was entered into by rogue activists who acted without receiving proper approval or oversight."  He promised, "I will be taking whatever action necessary to protect Oklahoma values."

54.     The very next day, on October 22, 2021, then-Commissioner Frye, announced his unexpected "resignation," which was effective immediately.

55.     Shortly thereafter, on November 8, 2021, Governor Stitt issued Executive Order 2021-24 ("Executive Order").  The Executive Order asserts that Oklahoma law does not "provide OSDH or others any legal ability to in any way alter a person's sex or gender on a birth certificate." The Executive Order directed OSDH to immediately "[c]ease amended birth certificates that is in any way inconsistent with 63 O.S. § 1-321."  The Executive Order specifies that the Commissioner of Health, among others, "shall cause the provisions of this Order to be implemented."  It also imposes obligations for OSDH to inform Governor Stitt's office of any pending litigation related to amending birth certificates and to provide any information responsive to the Executive Order. These obligations facilitate Governor Stitt's continued enforcement of the Executive Order and ongoing monitoring of what specific actions by OSDH might be deemed "inconsistent" with his office's interpretation of what is proscribed by the Executive Order, which is not self-evident.

56.     Defendants have enforced the Birth Certificate Policy through written communications that OSDH officials have sent to transgender people denying their request to

correct the sex designation on their birth certificate to match their gender identity.  They have denied such requests even where they were accompanied by court orders directing that the transgender person's birth certificate be amended to match their gender identity.  OSDH officials have stated that they believe they cannot grant such requests because of the Executive Order.  Upon information and belief, Governor Stitt and his office have enforced the Executive Order by specifically instructing OSDH officials that they cannot correct the birth certificates of transgender people to reflect their male or female gender identity.

57.     On April 26, 2022, Governor Stitt signed into law Senate Bill 1100 ("SB1100"), which states in relevant part that birth certificate sex designations "shall be either male or female and shall not be nonbinary or any symbol representing a nonbinary designation including but not limited to the letter 'X.'"  63 Okla. Stat. § 1-321.  Because designating a transgender man as "male" on his birth certificate, and designating a transgender woman as "female" on her birth certificate, do not involve a nonbinary designation, SB1100 does not prohibit transgender men and women from correcting their birth certificates to match their male or female gender identity.  To the extent that Defendants nonetheless regard SB1100 as a bar to such corrections, it falls within the scope of the challenged Birth Certificate Policy.

58.     The Birth Certificate Policy also stands in sharp contrast to the approach taken in at least 47 states, the District of Columbia and Puerto Rico, which permit transgender people to change the gender markers on their birth certificates to match their gender identity.  For example, every other state within the Tenth Circuit (Kansas, New Mexico, Colorado, Wyoming, and Utah) has a process by which transgender people can change the gender markers on their birth certificates.

59.     Similarly, the U.S. Department of State permits changes to the gender marker on a citizen's passport through self-certification.  Other federal agencies, such as the Social Security Administration, also allow transgender people to correct their gender in their records to match their gender identity.

60.     Oklahoma's Birth Certificate Policy is also contrary to its practice with respect to driver's licenses.  The Oklahoma Department of Public Safety allows transgender people to change the sex designations on their driver's licenses to reflect their gender identity.   Indeed, the Oklahoma Administrative Code specifically envisions that a supporting "court order or birth certificate for gender change" may be provided to update a cardholder's gender marker.  Okla. Admin. Code § 595:10-1-18(c)(6).

61.     OSDH also includes revision history that can disclose a person's transgender status when changing the name on a person's birth certificate following a legal name change.  Thus, for example, a transgender woman who had legally changed her first name from John to Jessica would receive an amended birth certificate with "+JESSICA" in the #1 field displaying a person's name and a notation stating "+DENOTES AMENDED ITEMS . . . CHG'D #1 FROM JOHN."

62.     Similarly, before the Executive Order, when OSDH corrected a transgender person's gender marker in the past, it included revision history disclosing a person's transgender status.  For example, a transgender woman would receive an amended birth certificate with "+FEMALE" in the #4 field displaying a person's sex designation and a notation stating "+DENOTES AMENDED ITEMS . . . CHG'D #4 FROM MALE."

63.     The Birth Certificate Policy is not supported by any compelling, substantial, or even legitimate government interest.

64.     The Birth Certificate Policy lacks any narrowly-tailored, substantial, or even rational relationship to a valid government interest, and it is not the least restrictive means of achieving a valid government interest.

65.     The Birth Certificate Policy is maintained and motivated by animus toward transgender people, including to the extent that it rests upon any actual or asserted statutory barriers to providing transgender people with birth certificates matching their gender identity.

66.     Regardless of any Oklahoma statute or regulation, and how any state court interprets Oklahoma law, the federal constitution independently secures the right of transgender people to correct their birth certificates to match their gender identity.  Because OSDH officials, including Defendants Reed and Baker, control the issuance and amendment of birth certificates, they have a constitutional duty to provide transgender people with access to birth certificates matching their gender identity.

**D.     Plaintiffs' Experiences**

**Plaintiff Rowan Fowler**

67.     Plaintiff Rowan Fowler is a 47-year-old woman who was born in Ponca City, Oklahoma and who currently resides in Tulsa, Oklahoma.

68.     Ms. Fowler received an associate's degree in graphic design from Oklahoma State University Institute of Technology in Okmulgee, and is a graphic designer by trade, although she has also worked most recently as an event planner.

69.     Ms. Fowler is transgender.  She was assigned the sex of male at birth, but she knew that something was "not right" about that fact for her entire life.  However, she did not have the language to describe her feelings until she took a psychology class in college when she was 19 years old.  It was in that context that she learned about what was then referred to as

"transsexualism," which is an outdated term formerly used in describing people whose gender identity did not match the sex they were assigned at birth.

70.     In light of the stigma surrounding transgender people, her own internalized transphobia, and other barriers to transitioning including access to gender-affirming health care, Ms. Fowler was not in a position to transition to live openly as a woman until later in her adult life.

71.     Ms. Fowler began her transition to live openly as female in 2021, when she was 46 years old.

72.     Since beginning her transition, Ms. Fowler has taken steps to bring her body and her gender expression into alignment with her female gender identity, including through clinically appropriate treatment undertaken in consultation with health care professionals.  Ms. Fowler has received a diagnosis of gender dysphoria, the treatment for which has included hormone therapy and social transition to living openly as female.

73.     On August 18, 2021, the District Court for Tulsa County granted Ms. Fowler's Petition for Name Change and Other Relief.  Ms. Fowler changed her first and middle names, which were traditionally male, to names that were consistent with her female gender identity.  She chose to take her mother's middle name of "Kay" for her own middle name as a way of honoring her family.

74.     In addition to changing her name, the August 18, 2021 court order granting Ms. Fowler's petition also ordered, adjudged, and decreed that Ms. Fowler is female; that any designation by Oklahoma agencies of Ms. Fowler being anything other than female is incorrect; and that she shall be designated as female on official documents generated, issued, or maintained in the State of Oklahoma.  In short, the court order affirmed Ms. Fowler's identity for who she

knew herself to be.  Receiving it was one of the happiest days of Ms. Fowler's life, because it validated her existence as a woman, and she hoped it would also facilitate her recognition as a woman by others.

75.     Ms. Fowler has taken steps to update her name and gender marker on her Oklahoma driver's license to match her female gender identity.   In doing so, however, Ms. Fowler encountered difficulty because staff had initially insisted that she needed to present a corrected birth certificate to update her driver's license, and a supervisor's intervention was ultimately required to process the update to her license.  Ms. Fowler has updated her name and gender in her records with the Social Security Administration as well as with the Transportation Security Administration for its PreCheck program.  She has also updated her name and gender in her records with the federal health insurance marketplace.

76.     As a result of the Birth Certificate Policy, however, Ms. Fowler's birth certificate fails to reflect her gender identity, which is female.  In August 2021, Ms. Fowler sought to update her birth certificate to match her gender identity by providing OSDH with a copy of the court order granting her Petition for Name Change and Other Relief and paying the requisite fee to OSDH.  In September 2021, OSDH cashed her check.  On January 11, 2022, however, she received an email from Defendant Baker denying her request to update her gender marker, which invoked the Governor's Executive Order in the denial.

77.     Defendants' refusal to issue Ms. Fowler a birth certificate consistent with her gender identity is a persistent and stigmatizing reminder that the State of Oklahoma refuses to recognize her as a woman.  That refusal also imposes a barrier on her ability to function successfully as a woman in all aspects of her life, including any time when she presents her birth

certificate to others.  Presenting an identity document that identifies her as male is not only humiliating but also dangerous, putting her at risk of violence.

78.    Ms. Fowler is aware of the high incidence of discrimination, harassment, and violence directed at transgender people.  This awareness comes, in part, from her involvement with the local community, including her work volunteering with Oklahomans for Equality and facilitating the gender support group with the Dennis R. Neill Equality Center in Tulsa.  She knows that transgender Oklahomans have reported being physically attacked because they are transgender.  Ms. Fowler has had experiences where she feared for her safety, including one instance when a stranger followed her around in public at night, causing her to retreat into a store out of fear for her safety.

79.    Businesses that are open to the general public may not be equally open to transgender Oklahomans.  Ms. Fowler has been denied equal service at a range of businesses in Oklahoma that are ostensibly open the general public, such as bars, restaurants, and hair and nail salons, because she is a transgender woman.

80.    Possessing a birth certificate that is incongruent with Ms. Fowler's gender identity and expression increases her exposure to harassment, discrimination, and violence.  She has experienced first-hand the hostility that transgender people often experience when presenting identification that conflicts with their lived gender.

81.    On one occasion in 2021 after beginning her transition, Ms. Fowler attempted to patronize a bar in Tulsa with friends.  It was one of her first times going out in public in typically feminine attire.  The bouncer asked for her identification, and Ms. Fowler presented her driver's license, which had not yet been updated to reflect her gender identity.  After examining her license,

the bouncer then said words to the effect of:  "We don't serve your kind here.  You can find someplace else to drink."

82.     The experience with the bar was deeply humiliating to Ms. Fowler.  It also made Ms. Fowler feel like she was a burden on her friends, some of whom had already gone inside the bar and had to come back outside to find another place to go.

83.     On another occasion around the same time in 2021, Ms. Fowler went with others to a restaurant in Broken Arrow, Oklahoma, and she ordered an alcoholic beverage.  Upon the waiter's request, Ms. Fowler presented her driver's license, which had not yet been updated to reflect her gender identity.  After inspecting her license, the waiter said words to the effect of "fucking tranny" as he was walking away—loud enough for others to hear it—and did not return to the table.  The word "tranny" is a derogatory term to describe transgender people.

84.     Because Ms. Fowler was early in her transition and still getting accustomed to living openly as a woman, even leaving the house had already felt difficult at the time.  The experience with the restaurant was soul-crushing.  It also contributed to Ms. Fowler fearing her safety when going about her everyday life as a transgender woman in Oklahoma.  For months after her experience with the restaurant in Broken Arrow, Ms. Fowler avoided going outside what she viewed as her "safety bubble," relatively speaking, around downtown Tulsa, for fear of who and what she might encounter in areas more hostile to transgender people.

85.     Inaccurate identity documents can also cause confusion.  On another occasion in 2021, Ms. Fowler presented her driver's license upon the request of a cashier while checking out at the grocery store.  While the cashier had previously addressed Ms. Fowler correctly as female up until that point, the cashier switched to incorrectly addressing her as male after seeing Ms. Fowler's driver's license that, at the time, inaccurately showed her sex as male.

86.     Similarly, the mismatch between Ms. Fowler's birth certificate and her other identity documents has caused problems for Ms. Fowler.  When she went to apply for the TSA PreCheck program in 2022, for instance, Ms. Fowler had to answer uncomfortable questions to explain the mismatch.

87.     Defendants' refusal to provide Ms. Fowler with a birth certificate matching her identity has also presented a barrier in Ms. Fowler's efforts to update her gender-related information with credit-related entities, which have insisted that they need a corrected birth certificate from her.

88.     Ms. Fowler will continue to need her birth certificate in the future, including to prove her identity to others, such as employers, and to furnish it when necessary for health insurance-related purposes.

**Plaintiff Allister Hall**

89.     Plaintiff Allister Hall is a 26-year-old man who was born in Tulsa, Oklahoma and who currently resides in Owasso, Oklahoma.

90.     Mr. Hall attended college in Oklahoma and was working towards a bachelor's degree in English Literature.  He was training to become a teacher and was one semester short of graduation before he had to withdraw in 2019 because of needed surgery for a serious heart condition.  That heart condition has also affected Mr. Hall's ability to work.

91.     Mr. Hall is transgender.  He was assigned the sex of female at birth, but he knew from early on that his gender identity was male.  However, he lacked even the vocabulary to describe who he was until he was 14 years old.

92.     Mr. Hall grew up in a community that felt unaccepting of transgender people, and he lived a mostly "closeted" existence until he was 20 years old.  After he moved away for college,

and had greater distance from the community in which he had grown up, Mr. Hall began to live more openly as male.

93.     Since beginning his transition, Mr. Hall has taken steps to bring his body and his gender expression into alignment with his male gender identity, including through clinically appropriate treatment undertaken in consultation with health care professionals.  Mr. Hall has received a diagnosis of gender dysphoria, the treatment for which has included hormone therapy and social transition to living openly as male.  As a result of hormone therapy, Mr. Hall has a more typically masculine appearance, including visible facial hair.

94.     On August 24, 2021, the District Court for Tulsa County granted Mr. Hall's Petition for Name Change and Other Relief.  Mr. Hall changed his first and middle names, which were more typically feminine, to names that were more consistent with his male gender identity.

95.     In addition to changing his name, the August 24, 2021 court order granting Mr. Hall's petition also ordered, adjudged, and decreed that Mr. Hall is male; that any designation by Oklahoma agencies of Mr. Hall being anything other than male is incorrect; and that he shall be designated as male on official documents generated, issued, or maintained in the State of Oklahoma.

96.     Mr. Hall has taken steps to update his name and gender marker on his Oklahoma driver's license to match his male gender identity.  Mr. Hall has also updated his name and gender in his records with the Social Security Administration.

97.     As a result of the Birth Certificate Policy, however, Mr. Hall's birth certificate fails to reflect his gender identity, which is male.  The very next day after receiving the August 24, 2021 court order, Mr. Hall applied to update his birth certificate to match his gender identity and paid the requisite OSDH fee.  On January 11, 2022, however, Mr. Hall received an email from

22

Defendant Baker denying his request to update his gender marker, which invoked the Governor's Executive Order in the denial.

98.     Defendants' refusal to issue Mr. Hall a birth certificate consistent with his gender identity is a persistent and stigmatizing reminder that the State of Oklahoma refuses to recognize him as a man.  That refusal also imposes a barrier on his ability to function successfully as a man in all aspects of his life, including any time when he needs to present his birth certificate to others. Presenting an identity document that identifies him as female is not only humiliating but also dangerous, putting him at risk of violence.

99.     Mr. Hall is aware of the high incidence of discrimination, harassment, and violence directed at transgender people.  When Mr. Hall has traveled to places that are more likely to be hostile to transgender people, he has felt nervous and scared that he could be the subject of a hate crime because he is transgender.  On multiple occasions, Mr. Hall has also had strangers follow him around in public, causing him to fear for his safety as a transgender person.

100.     Possessing a birth certificate that is incongruent with Mr. Hall's gender identity and expression increases his exposure to harassment, discrimination, and violence.  He has experienced first-hand the hostility that transgender people often experience when presenting identification that conflicts with their lived gender.

101.     For example, there were occasions before Mr. Hall's driver's license was updated to reflect his gender identity when he needed to present it to others, such as a bartender, and he encountered hostility when the person inspecting it realized that he was transgender.  In those instances, Mr. Hall feared that he might be asked to leave or that others who were nearby might attack him because he is transgender.  These experiences also deprived Mr. Hall of control over the disclosure of private information concerning his transgender status.

102.    Defendants' actions in barring Mr. Hall from correcting his birth certificate to match his gender identity has also impeded his ability to correct other identity documents to match his gender identity.  As a member of the Choctaw Nation of Oklahoma, Mr. Hall possesses a tribal membership card that identifies him by name and gender.  However, when he sought to update that membership card to match his gender identity, he was informed that he would need to present a corrected birth certificate.  Trial membership cards are used in accessing a number of tribal services, including health services.

103.    Mr. Hall will continue to need his birth certificate in the future, including to prove his identity to others, and to update other identity documents such as his tribal membership card.

**Plaintiff C.R.**

104.    Plaintiff C.R. is a 23-year-old man who was born in Tulsa, Oklahoma and who currently resides within Creek County, Oklahoma.

105.    C.R. is a health care worker.  He assists in providing patient care and is also a licensed Emergency Medical Technician (EMT).  C.R. sought out a career in the health care field in order to be able to help other people, and he has provided care to Oklahomans during the COVID-19 epidemic.  He is also currently working towards becoming a paramedic.

106.    C.R. is transgender.  He was assigned the sex of female at birth, but he realized in high school that his gender identity was male.  For example, when he saw his male peers, he felt that he should be among them.  However, C.R. grew up in an area of Oklahoma that did not feel accepting of transgender people, which made it more difficult for him to come to terms with his identity.

107.    C.R. began his transition to live openly as male when he was 21 years old.

108.    Since beginning his transition, C.R. has taken steps to bring his body and his gender expression into alignment with his male gender identity, including through clinically appropriate treatment undertaken in consultation with health care professionals.  C.R. has received a diagnosis of gender dysphoria, the treatment for which has included hormone therapy and social transition to living openly as male.  As a result of hormone therapy, C.R. has a more typically masculine expression, including a typically male voice.

109.    On June 24, 2021, the District Court for Creek County granted C.R.'s Petition for Change of Name and Gender Marker.  C.R. changed his first name, which was traditionally female, to a name that was consistent with his male gender identity.

110.    In addition to changing his name, the June 24, 2021 court order granting C.R.'s petition also ordered, adjudged, and decreed that the gender marker on C.R.'s birth certificate be changed to male and that OSDH issue a new birth certificate consistent with the changes ordered.

111.    C.R. has taken steps to update his name and gender marker on his Oklahoma driver's license to match his male gender identity.  In doing so, however, C.R. encountered difficulty because staff initially indicated that he needed his birth certificate to update his driver's license, although they subsequently processed his request after a period of delay.  C.R. has also taken steps to update his name and gender in his records with the Social Security Administration, the bodies that license and maintain a registry of EMTs, his health insurance provider, and the school where he has taken coursework.

112.    As a result of the Birth Certificate Policy, however, C.R.'s birth certificate fails to reflect his gender identity, which is male.  In July 2021, C.R. applied to correct his birth certificate to match his gender identity and paid the requisite OSDH fee.  On March 2, 2022, however, he

received an email from Defendant Baker denying his request to update his gender marker, which invoked the Governor's Executive Order in the denial.

113. Defendants' refusal to issue C.R. a birth certificate consistent with his gender identity is a persistent and stigmatizing reminder that the State of Oklahoma refuses to recognize him as a man. That refusal also imposes a barrier on his ability to function successfully as a man in all aspects of his life, including any time when he needs to present his birth certificate to others. Presenting an identity document that identifies him as female is not only humiliating but also dangerous, putting him at risk of violence.

114. C.R. is aware of the high incidence of discrimination, harassment, and violence directed at transgender people. Particularly during the time immediately after C.R. began his transition and started hormone therapy, there were circumstances in public when others would give him strange looks and he would fear for his physical safety.

115. Possessing a birth certificate that is inconsistent with C.R.'s gender identity and expression increases his exposure to harassment, discrimination, and violence. He has experienced first-hand the hostility that transgender people often experience when presenting identification that conflicts with their lived gender.

116. There were occasions before C.R.'s driver's license was updated to reflect his gender identity when he needed to present it to others, but he encountered significant resistance in using the license. These third parties did not believe that C.R., whom they correctly perceived as male, was the actual license holder, who was designated as female on the license.

117. For example, C.R. patronized a bowling alley with a friend in 2021, but when C.R. ordered a drink and presented his license upon request, the manager did not believe that C.R. was the license holder. The manager escalated the situation by bringing over a second manager, and

then brought over a third employee, all in order to discuss C.R. and deliberate about what to do with him.  One of them said he believed that C.R. must be using a sibling's license.  Having a routine trip to a bowling alley with a friend turn into a public dispute over his identity was insulting, angering, and demoralizing.

118.    On another occasion in 2021 before C.R.'s driver's license had been updated to reflect his gender identity, an Oklahoma patrol officer pulled C.R. over for potentially exceeding the speed limit when driving home from work.  When C.R. presented his license, the officer did not believe that it was C.R.'s license.  C.R. has family who were in law enforcement, and he understood that law enforcement would generally ask a driver to step out of the vehicle in order to question them, which could require C.R. to explain his transgender status to the law enforcement officer.  Fortunately, the officer let the issue go after running C.R.'s information, but the experience left C.R. fearful and unnerved.

119.    After repeated instances of having his identity interrogated, debated, and doubted by third parties because of the mismatch between his identity documents and his gender identity, C.R. fell into a depressive state and began to self-isolate.  He declined invitations from friends or families when they wanted to go out, and he stayed at home alone instead.

120.    C.R. has also experienced hostility in the workplace because he is transgender. C.R. has had coworkers who have refused to use male pronouns and insisted on using female pronouns when referring to him.  One coworker also told C.R. that the coworker would not use male pronouns until the point when C.R. had corrected his driver's license.  In C.R.'s current primary place of employment, he is not generally open about the fact that he is transgender, because he is concerned that he may be subjected to discrimination as a result.

121.    Not having a birth certificate that matches C.R.'s gender identity has presented other practical obstacles in his life.  For example, after he bought his house from his mother, C.R. sought to obtain services under his own name, and he was informed that he needed two forms of identification, one of which could be his birth certificate.  He encountered similar issues when seeking to update his information with a credit card company and with the body handling EMT licensing or registration, which initially requested C.R.'s birth certificate and then required C.R. to determine if there were alternate ways of proving his identity.

122.    C.R. will continue to need his birth certificate in the future, including to prove his identity to others.

## CLAIMS FOR RELIEF

### COUNT I – DEPRIVATION OF EQUAL PROTECTION
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION

123.    Plaintiffs hereby incorporate by reference and reallege all of the preceding paragraphs of this Complaint as though fully set forth herein.

124.    The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

125.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex as well as discrimination based on transgender status is presumptively unconstitutional and subject to heightened scrutiny.

126.    The Birth Certificate Policy facially and intentionally discriminates against transgender people based on sex-related considerations.  The sex that the government lists on an individual's birth certificate is an express governmental classification of an individual's sex.  In the case of transgender people, however, this classification reflects a sex contrary to their gender

identity and causes harm.  Discrimination based on sex-related considerations includes, but is not limited to, discrimination based on gender, gender identity, transgender status, gender transition, and nonconformity with sex stereotypes.

127.   The Birth Certificate Policy facially and intentionally discriminates on the basis of transgender status by depriving transgender people who were born in Oklahoma of birth certificates that accurately reflect their gender identity.  Others born in Oklahoma, who are not transgender, are not deprived of birth certificates that accurately reflect their gender identity.

128.   Discrimination because a person is transgender constitutes (a) discrimination based on sex, which requires courts to apply heightened scrutiny when evaluating the constitutionality of the government's discrimination, and (b) discrimination based on transgender status, which also requires courts to apply heightened scrutiny to such discrimination.

129.   Government discrimination against transgender people because of their transgender status bears indicia of a suspect classification requiring heightened scrutiny by the courts because:

    a.   Transgender people have suffered a long history of extreme discrimination and continue to suffer such discrimination to this day;

    b.   Transgender people are a politically vulnerable minority whose rights are not protected through the legislative process.  Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination, and have been and continue to be regularly targeted for discrimination by legislation, regulations, and other government action that harms them;

    c.   A person's gender identity or transgender status bears no relation to a person's ability to contribute to society; and

d.  Gender identity is a core, defining trait that is so fundamental to a person's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.  Gender identity is also generally fixed at an early age and highly resistant to voluntary change.

130.  The Birth Certificate Policy deprives transgender people born in Oklahoma like Plaintiffs of their right to equal dignity and stigmatizes them as second-class citizens in violation of the Equal Protection Clause.

**COUNT II – DEPRIVATION OF DUE PROCESS
IN VIOLATION OF THE FOURTEENTH AMENDMENT
OF THE UNITED STATES CONSTITUTION**

131.  Plaintiffs hereby incorporate by reference and reallege all of the preceding paragraphs of this Complaint as though fully set forth herein.

132.  The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

133.  The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure. Government infringement of these protections requires courts to apply strict scrutiny to such government action.

134.  The involuntary disclosure of a person's transgender status violates that person's fundamental right to privacy.  The fact that a person is transgender constitutes highly personal and intimate information.  A reasonable person would find the involuntary disclosure of a person's transgender status to be deeply intrusive.

135.    The involuntary disclosure of a person's transgender status can also cause significant harm, including by placing a person's personal safety and bodily integrity at risk.  This harm burdens and interferes with the ability of transgender people to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary and critical for mental health and well-being.

136.    The Birth Certificate Policy violates transgender people's right to privacy by causing disclosures of their transgender status and depriving them of significant control over the circumstances around such disclosure.

137.    There is no compelling, important, or even legitimate interest in the government causing transgender people to involuntarily disclose their transgender status any time third parties see their birth certificates.

138.    The Birth Certificate Policy also burdens transgender people's liberty interests, including the right to define and express a person's gender identity and the right not to be treated in a manner contrary to a person's gender by the government.  The constitutional protections that shelter a person's medical decisions, bodily autonomy, dignity, expression, and personhood prohibit the government from interfering with the right to live in accordance with a person's gender identity.

## COUNT III – ABRIDGEMENT OF FREE SPEECH IN VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

139.    Plaintiffs hereby incorporate by reference and reallege all of the preceding paragraphs of this Complaint as though fully set forth herein.

140.    The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983 and applicable to the states through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.

31

141.    The First Amendment protects both the right to speak and the right to refrain from speaking.

142.    The Birth Certificate Policy violates the First Amendment rights of transgender people to refrain from speaking by compelling them to disclose their transgender status and to identify with a gender that conflicts with who they are.  It also prevents transgender people from accurately expressing their gender when they present their birth certificates to others.

143.    The Birth Certificate Policy further violates the First Amendment rights of transgender people by forcing them to endorse the government's position as to their own gender, through the birth certificates they must show to others.  The gender marker listed on their birth certificates conveys the government's message that sex is determined solely by the appearance of external genitalia at birth—a message that is inconsistent with the medical and scientific understanding of sex and to which Plaintiffs strongly object.

## **PRAYER FOR RELIEF**

*WHEREFORE*, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants on all claims as follows:

A.    Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201-02, declaring the actions of Defendants complained of herein, including the enforcement of the Birth Certificate Policy, violate the equal protection, due process, and free speech guarantees of the U.S. Constitution;

B.    Permanently enjoin Defendants, their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them from enforcing the Birth Certificate Policy, including from refusing to provide birth certificates to transgender people like Plaintiffs that accurately reflect their sex, consistent with their gender identity, and

without the inclusion of information that would disclose an individual's transgender status on the face of the birth certificate;

      C.      Order Defendants to immediately issue corrected birth certificates to Plaintiffs Fowler, Hall, and C.R., accurately reflecting their sex, consistent with their gender identity, and without the inclusion of information that would disclose their transgender status on the face of their birth certificates;

      D.      Order Defendants to take any necessary and appropriate action to ensure that transgender people can correct their Oklahoma birth certificates to match their gender identity, without the inclusion of information that would disclose their transgender status on the face of their birth certificate, including through the adoption of any regulations to guarantee such access;

      E.      Order Defendants to maintain the confidentiality of information disclosing a person's transgender status, including their sex assigned at birth and previous names, as applicable;

      F.      Award Plaintiffs costs, expenses, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

      G.      Grant any injunctive or other relief this Court deems just, equitable, and proper.

DATED:  July 29, 2022

Respectfully submitted,

/s/ Shelly L. Skeen
Shelly L. Skeen*
Nicholas Guillory*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Ave, Ste. 500
Dallas, TX 75219
Telephone: (214) 219-8585
Fax: (214) 481-9140
sskeen@lambdalegal.org

Karen Keith Wilkins, OBA# 21005
1515 S. Denver Ave.
Tulsa, OK 74119
Telephone: (918) 599-8118
Fax: (918) 599-8119
karen@wilkinslawtulsa.com

nguillory@lambdalegal.org

Peter C. Renn*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Ste. 280
Los Angeles, CA 90010
Telephone: (213) 382-7600
Fax: (213) 402-2537
prenn@lambdalegal.org

*Attorneys for Plaintiffs*

\*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 29, 2022, I electronically transmitted the foregoing

document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of

Electronic Filing to all ECF registrants, including Defendants Kevin Stitt, Keith Reed, and Kelly

Baker.

/s/ Shelly L. Skeen
Shelly L. Skeen