UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

ROWAN FOWLER, *et al.*,

                *Plaintiffs,*

    v.

KEVIN STITT, *et al.*

                *Defendants.*

No.   22-CV-00115-GKF-SH

## DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT

Submitted by:

ZACH WEST, OBA #30768
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov

BRYAN CLEVELAND, OBA #33860
  *Deputy Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Bryan.Cleveland@oag.ok.gov

AUDREY WEAVER, OBA #33258
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Audrey.Weaver@oag.ok.gov

**COUNSEL FOR DEFENDANTS**
                                          **August 26, 2022**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION..................................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT AND AUTHORITIES.....................................................................................5

I.      STANDARD OF REVIEW .........................................................................................5

II.     PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER THE EQUAL
        PROTECTION CLAUSE (COUNT I). ......................................................................6

        A.      *Plaintiffs fail to allege any set of facts to establish the Oklahoma Birth
                Certificate Law purposefully discriminates between groups of people.*......................7

        B.      *Plaintiffs fail to provide any set of facts to establish the Oklahoma Birth
                Certificate Law purposefully discriminates against a suspect class.*........................10

        C.      *The Oklahoma Birth Certificate Law survives rational basis review* ........................15

III.    PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER SUBSTANTIVE
        DUE PROCESS (COUNT II)...............................................................................17

IV.     PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER THE FIRST
        AMENDMENT (COUNT III). ..............................................................................21

CONCLUSION...............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Anonymous v. Anonymous,*
  325 N.Y.S.2d 499 (N.Y. Sup. Ct. 1971) ...............................................................17

*Ashaheed v. Currington,*
  7 F.4th 1236 (10th Cir. 2021) .............................................................................6

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................5, 8

*Aulson v. Blanchard,*
  83 F.3d 1 (1st Cir. 1996) ....................................................................................5

*Ballard v. United States,*
  329 U.S. 187 (1946) ..........................................................................................12

*Barney v. Pulsipher,*
  143 F.3d 1299 (10th Cir. 1998) ..........................................................................6

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................5

*Bostock v. Clayton Cnty., Georgia,*
  140 S. Ct. 1731 (2020) ...............................................................................*passim*

*Brown v. Zavaras,*
  63 F.3d 967 (10th Cir.1995) ..............................................................................10

*Cape v. Tennessee Secondary Sch. Athletic Ass'n,*
  563 F.2d 793 (6th Cir. 1977), *abrogated in part in Brentwood Acad. v. Tennessee Secondary Sch.*
  *Athletic Ass'n,* 190 F.3d 705 (6th Cir. 1999) .....................................................14

*Carcano v. McCrory,*
  203 F. Supp. 3d 615 (M.D. N.C. 2016) ..............................................................14

*Caskey Baking Co. v. Virginia,*
  313 U.S. 117 (1941) ............................................................................................9

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) .........................................................................................6, 7

*Coe v. U.S. Dist. Court for Dist. of Colorado,*
  676 F.2d 411 (10th Cir. 1982) ...........................................................................24

*Coleman v. Court of Appeals of Maryland,*
  566 U.S. 30 (2012) ..............................................................................................9

*Crawford v. Bd. of Educ. of City of Los Angeles*,
    458 U.S. 527 (1982) .................................................................................................. 8, 9

*Dobbs v. Jackson Women's Health Org.*,
    142 S.Ct. 2228 (2022) ...................................................................................... 17, 18, 20

*Doe v. Luzerne Cty.*,
    660 F.3d 169 (3d Cir. 2011) .......................................................................................... 16

*Druley v. Patton*,
    601 F. App'x. 632 (10th Cir. 2015) (unpublished) ...................................................... 10

*Etsitty v. Utah Transit Auth.*,
    502 F.3d 1215 (10th Cir. 2007), *overruled in part on other grounds in Tudor v. Se. Oklahoma*
    *State Univ.*, 13 F.4th 1019 (10th Cir. 2021) .......................................................... 10, 14

*Faulkner v. Jones*,
    10 F.3d 226 (4th Cir. 1993) .......................................................................................... 16

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) .............................................................................................. 12, 23

*F.S. Royster Guano Co. v. Virginia*,
    253 U.S. 412 (1920) .................................................................................................. 9, 10

*Hartin v. Dir. of Bureau of Records & Statistics, Dep't of Health of City of New York*,
    347 N.Y.S.2d 515 (N.Y. Sup. Ct. 1973) ...................................................................... 25

*Heller v. Doe by Doe*,
    509 U.S. 312 (1993) .............................................................................................. 15, 16

*Herring v. Keenan*,
    218 F.3d 1171 (10th Cir. 2000) .................................................................................... 19

*Ingram v. Cooper*,
    163 F. Supp. 3d 1133 (N.D. Okla. 2016) ...................................................................... 7

*In re Estate of Gardiner*,
    42 P.3d 120 (Kan. 2002) .............................................................................................. 17

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
    97 F. Supp. 3d 657 (W.D. Pa. 2015) ...................................................................... 14, 15

*K. v. Health Div., Dep't of Human Res.*,
    560 P.2d 1070 (Or. 1977) .............................................................................................. 25

*Leiser v. Moore*,
    903 F.3d 1137 (10th Cir. 2018) .............................................................................. 18, 19

*Lindsey v. Hyler,*
    918 F.3d 1109 (10th Cir. 2019) ........................................................................18

*Littleton v. Prange,*
    9 S.W.3d 223 (Tex. App. 1999) ........................................................................17

*McCleskey v. Kemp,*
    481 U.S. 279 (1987) ......................................................................................6, 7

*Michael M. v. Superior Court of Sonoma Cty.,*
    450 U.S. 464 (1981) ...................................................................................12, 13

*NASA v. Nelson,*
    562 U.S. 134 (2011) ........................................................................................18

*Neitzke v. Williams,*
    490 U.S. 319 (1989) ..........................................................................................5

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977) ........................................................................................18

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) .......................................................................................13, 14

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ........................................................................................21

*SECSYS, LLC v. Vigil,*
    666 F.3d 678 (10th Cir. 2012) .............................................................6, 7, 8, 10

*Shurtleff v. City of Boston, Massachusetts,*
    142 S. Ct. 1583 (2022) ....................................................................................21

*Southern Methodist University Ass'n v. Wynne & Jaffe,*
    599 F.2d 707 (5th Cir. 1979) ...........................................................................24

*Taylor v. Roswell Indep. Sch. Dist.,*
    713 F.3d 25 (10th Cir. 2013) ..............................................................................6

*Teigen v. Renfrow,*
    511 F.3d 1072 (10th Cir. 2007) ..........................................................................6

*Timbs v. Indiana,*
    139 S. Ct. 682 (2019) ......................................................................................17

*Tonkovich v. Kan. Bd. of Regents,*
    159 F.3d 504 (10th Cir. 1998) ............................................................................6

*Tuan Anh Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) ................................................................................................ 12

*Tudor v. Se. Oklahoma State Univ.,*
    13 F.4th 1019 (10th Cir. 2021) ..................................................................... 11, 12

*Ulane v. E. Airlines, Inc.,*
    742 F.2d 1081 (7th Cir. 1984) .......................................................................... 14

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001) ........................................................................................... 23

*United States v. Virginia,*
    518 U.S. 515 (1996) ..................................................................................... *passim*

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ............................................................................... 21, 22, 23

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ........................................................................................... 18

*Whalen v. Roe,*
    429 U.S. 589 (1977) ........................................................................................... 18

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ........................................................................................... 21

*Wyoming v. United States,*
    279 F.3d 1214 (10th Cir. 2002) .......................................................................... 5

*York v. Story,*
    324 F.2d 450 (9th Cir. 1963) ............................................................................. 16

**Statutes:**

63 O.S. § 1-301 .......................................................................................................... 2

63 O.S. § 1-303 .......................................................................................................... 2

63 O.S. § 1-311 ................................................................................................. 2, 4, 23

63 O.S. § 1-321 .................................................................................................. *passim*

28 U.S.C. § 1739 ...................................................................................................... 23

**Rules:**

Fed. R. Civ. P. 12 .................................................................................................... 2, 5

Fed. R. Civ. P. 44 ........................................................................................................23

Fed. R. Evid. 201 .......................................................................................................23

**Regulations**:

Okla. Admin. Code § 310:105-3-3 ..............................................................................4

6 C.F.R. § 37.17 ........................................................................................................24

8 C.F.R. § 274a.2 ......................................................................................................24

**Legislative Materials:**

S.B. 1100, 2022 O.S.L. 87 ..........................................................................................9

**Executive Materials**:

Exec. Order No. 2021-24 (Nov. 8, 2021)................................................................. 1, 4, 5, 7

**Secondary Authorities:**

Alice M. Hetzel, U.S. DEP'T OF HEALTH AND HUM. SERVS., CTRS. FOR DISEASE CONTROL
    AND PREVENTION, NAT'L CTR. FOR HEALTH STATS., *U.S. Vital Statistics System - Major
    Activities and Developments, 1950-95* (1997) ..............................................................2, 3

AM. BAR ASS'N,
    *Birth Certificates* (Nov. 20, 2018) ..........................................................................3

Craig Konnoth, *Health Data Federalism,*
    101 B.U.L. Rev. 2169 (2021) ..................................................................................3

OFF. OF INSPECTOR GEN., DEP'T OF HEALTH AND HUM. SERVS.,
    *Birth Certificate Fraud,* (Sept. 2000) ......................................................................3

OKLAHOMA HISTORICAL SOCIETY, *About the 1890 Oklahoma Territorial Census* .......................2

U.S. DEP'T OF HEALTH AND HUM. SERVS., NAT'L CTR. FOR HEALTH STATS.,
    *Hospitals' and Physicians' Handbook on Birth Registration and Fetal Death Reporting*
    (Oct. 1987) ..........................................................................................................3

Ventura SJ, *The U.S. National Vital Statistics System: Transitioning Into the 21ˢᵗ Century, 1990-2017
    – Programs and Collection Procedures*, 1 Vital and Health Statistics 62 (Mar. 2018) ................3

**INTRODUCTION**

Biological sex, as the Oklahoma Legislature and U.S. Supreme Court have confirmed, is not a meaningless label. Like race and national origin, sex is a certifiable and immutable characteristic determined at birth. The physical differences between the two sexes—man and woman; male and female—are a legal and factual reality, not fiction. And because transgender status occurs when an individual's "gender identity diverges from the sex they were assigned at birth[,]" *i.e.* biological sex, Doc. 21 at ¶ 23, it too is "inextricably bound up with sex." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1742 (2020); *see also* Doc. 21 at ¶ 21. An individual, by definition, cannot be transgender unless their birth sex is different than their current gender identity.

Plaintiffs' suit challenges the constitutionality of Oklahoma law and a November 2021 Executive Order prohibiting the retroactive alteration of an individual's birth sex marker on state-issued birth certificates ("Birth Certificate Law"). *See* 63 O.S. § 1-321; Exec. Order No. 2021-24 (Nov. 8, 2021).[1] Because State officials enforce the Birth Certificate Law and refuse to alter the sex reported on Plaintiffs' birth certificates to conform to their current gender identities, Plaintiffs allege the Defendants violate the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. Each of Plaintiffs' claims fails as a matter of law.

Plaintiffs' requested relief seeks to compel the State to alter objective, factual information reported *about birth*, *at the time of birth*, and *in a record that functions to document birth*. The State's inclusion of (and refusal to amend) birth sex on a birth certificate does not compel Plaintiffs to speak or even implicate Plaintiffs' private speech. Plaintiffs' claim, on the other hand, would compel the State to speak a certain way in its own government-issued and maintained records, including by erasing any records reflecting anything other than an individual's preferred gender identity.

---

[1] available at https://www.sos.ok.gov/documents/executive/2014.pdf (last visited Aug. 24, 2022).

While Plaintiffs summarily claim the Birth Certificate Law discriminates on the basis of sex, they have no evidence of sex discrimination, and their legal theory regarding suspect classes actually supplants sex with subjective gender identity. There is no serious dispute that the Birth Certificate Law is facially neutral as to everyone and does not discriminate between the two sexes or otherwise. Plaintiffs' claim is a trojan horse that outwardly professes to protect transgender individuals from discrimination but inwardly ushers in the destruction of sex classifications altogether. It conflates gender identity with sex and undermines the established distinction between the two.

Plaintiffs' claim that the inclusion of (and refusal to amend) birth sex on a birth certificate somehow violates a right to privacy in their transgender status is even less availing. Disclosing birth sex does not directly disclose transgender status, which requires knowledge of both birth sex and current gender identity. But even assuming some constitutional right to informational privacy exists, which is questionable at best, birth sex is not the type of confidential, personal, or medical information that if disclosed would shock the conscience. And in any event, Plaintiffs fail to establish that the State's inclusion of birth sex on a birth certificate constitutes a third-party government disclosure.

Plaintiffs' far-sweeping constitutional theories have no basis in law. Accordingly, no set of facts could establish a plausible claim for relief, and dismissal under Fed. R. Civ. P. 12(b)(6) is proper.

## BACKGROUND

Oklahoma has long maintained and operated a system of vital statistics, including vital records registering birth and recording certain personal information related thereto. *See, e.g.,* 63 O.S. §§ 1-301, 1-303, 1-311; *see also* OKLAHOMA HISTORICAL SOCIETY, *About the 1890 Oklahoma Territorial Census.*[2] Recording vital statistics on birth, including sex, is a well-established state and local government practice pre-dating the American Revolution and continuing today. *See* Alice M. Hetzel, U.S. DEP'T

---

[2] available at https://www.okhistory.org/research/1890 (last visited May 5, 2022).

OF HEALTH AND HUMAN SERVS., CTRS. FOR DISEASE CONTROL AND PREVENTION, NAT'L CTR. FOR HEALTH STATS., *U.S. Vital Statistics System - Major Activities and Developments, 1950-95* (1997) at pp. 43-47. [3] Vital statistics are "an indispensable component of the U.S. public health system[,]" and provide important data making "it possible to track indicators of health status for the population at the national, state, and local levels, including disparities by age, sex, race and ethnicity, and detailed geography." Ventura SJ, *The U.S. National Vital Statistics System: Transitioning Into the 21st Century, 1990-2017 – Programs and Collection Procedures*, 1 Vital and Health Statistics 62, p. v (Mar. 2018).[4]

A birth certificate "is a statement of facts concerning an individual[]" and "is a permanent legal record." U.S. DEP'T OF HEALTH AND HUM. SERVS., NAT'L CTR. FOR HEALTH STATS., *Hospitals' and Physicians' Handbook on Birth Registration and Fetal Death Reporting* p. 1 (Oct. 1987) (emphasis added) ["Hospitals' and Physicians' Handbook"];[5] *see also* AM. BAR ASS'N, *Birth Certificates* (Nov. 20, 2018)[6] ("A birth certificate is a document issued by a government that records the birth of a child for vital statistics, tax, military, and census purposes.").[7] Because vital records, including certificates of birth, report objective and factual information, are used to establish identity, and constitute permanent legal records, "it is essential that the certificates and reports be prepared accurately." *Hospitals' and Physicians' Handbook* at p. 7; *see also* OFF. OF INSPECTOR GEN., DEP'T OF HEALTH AND HUM. SERVS., *Birth Certificate Fraud*, p. 2 (Sept. 2000)[8] ("Legitimate birth certificates provide vital information about the person whose name appears on the certificate.").

---

[3] available at https://www.cdc.gov/nchs/data/misc/usvss.pdf (last visited Apr. 27, 2022).
[4] available at https://www.cdc.gov/nchs/data/series/sr_01/sr01_062.pdf (last visited Apr. 27, 2022).
[5] available at https://www.cdc.gov/nchs/data/misc/hb_birth.pdf (last visited Apr. 27, 2022).
[6] available at https://www.americanbar.org/groups/public_education/publications/teaching-legal-docs/birth-certificates/ (last visited Apr. 27, 2022).
[7] Although Congress has developed recommendations and guidance to state governments on matters of vital statistics, no federal law requires states to collect or report specific information on birth certificates. *See generally* Craig Konnoth, *Health Data Federalism*, 101 B.U.L. Rev. 2169, 2196 (2021); *see also* Hospitals' and Physicians' Handbook at p. 2. This discretion rests solely with each state.
[8] available at http://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf (last visited Apr. 27, 2022).

Under Oklahoma law, a certificate of birth must be filed with the Oklahoma State Registrar shortly after the birth. *See* 63 O.S. § 1-311(A). The individual preparing the certificate, typically the attending physician, "shall certify to the facts of birth and provide the medical information required by the certificate . . . ." *See* 63 O.S. § 1-311(B). By signing the certificate worksheet, the parent "attest[s] to the accuracy of the personal data entered thereon . . . ." *See* 63 O.S. § 1-311(E).

The Birth Certificate Law provides that "[a] certificate or record registered under this article may be amended only in accordance with this article and regulations thereunder adopted by the State Commissioner of Health to protect the integrity and accuracy of vital statistics records." 63 O.S. § 1-321(A). Section 1-321 only permits changes to name change and to paternity in certain circumstances, with no other amendments allowed. *See id.* § 1-321; *see also* Okla. Admin. Code § 310:105-3-3 ("After its acceptance for filing, no birth certificate . . . shall be altered or changed in any respect on its face, except as provided in . . . this Section."). The statute also preserves the information recorded at birth by requiring a record of any amendments. *See* 63 O.S. § 1-321(B).

In years prior, some Oklahoma state trial courts have disregarded this statute as not binding on them as a matter of state law. For example, certain courts in the past issued orders requiring the amendment of individual birth certificates notwithstanding the relevant statutes and often without any prior notice to the State. The Oklahoma State Department of Health ("OSDH") complied with those court orders, believing Oklahoma law required said compliance notwithstanding the need to protect the integrity and accuracy of vital statistics records. *See id.* § 1-321(A).

On November 8, 2021, the Governor issued Executive Order 2021-24 ("Executive Order"), which ordered the OSDH to "[c]ease amending birth certificates that is in any way inconsistent with 63 O.S. § 1-321." Exec. Order No. 2021-24 at p. 1 (Nov. 8, 2021). The Executive Order noted that neither Oklahoma law nor any administrative rules "provide OSDH or others any legal ability to in any way alter a person's sex or gender on a birth certificate." *Id.* After the issuance of this Executive

4

Order, the Oklahoma Legislature amended Section 1-321 to clarify that the sex designation on birth certificates is "the biological sex designation . . . ." 63 O.S. § 1-321(H); *see* Doc. 21 at ¶ 57. This statute, along with the Executive Order, confirmed that state law forbids OSDH from amending the sex designation on a birth certificate for any reason. No petitioner, including these Plaintiffs, has sought enforcement orders from state court or appealed to the Oklahoma Supreme Court for its view on this issue of state law interpretation. Instead, Plaintiffs filed this federal suit, challenging the Birth Certificate Law under the U.S. Constitution.

## ARGUMENT AND AUTHORITIES

### I.   STANDARD OF REVIEW

To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). While courts must view a complaint in a light most favorable to the nonmoving party, drawing all reasonable inferences therefrom, courts need not accept as true "labels and conclusions," legal characterizations, unwarranted deductions of fact, or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678-679 (citation omitted). In other words, a court need not "swallow the plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

When a complaint presents a question of law and "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint "must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation omitted). Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law . . . ." *Id.* at 326; *see also Wyoming v. United States*, 279 F.3d 1214, 1222 (10th Cir. 2002).

## II. PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER THE EQUAL PROTECTION CLAUSE (COUNT I).

Plaintiffs' claim that the Birth Certificate Law violates the Equal Protection Clause cannot survive as a matter of law. *See* Doc. 21 at ¶¶ 123-130. Plaintiffs fail to plead any set of facts upon which this Court could conclude the Birth Certificate Law intentionally discriminates against any class, based on sex or otherwise. Moreover, courts have rightly rejected gender identity as a suspect class.

Although the Equal Protection Clause of the Fourteenth Amendment generally directs that "all persons similarly situated should be treated alike[,]" it "doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningful dissimilar situations." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). The Equal Protection Clause "does not forbid classifications," nor does it create substantive rights. *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 54 (10th Cir. 2013) (citation omitted); *see also Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007). Consequently, "[u]nless a legislative classification or distinction burdens a fundamental right or targets a suspect class, courts will uphold it if it is rationally related to a legitimate end." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998).

To establish an Equal Protection Clause violation, a plaintiff must first establish "the challenged state action intentionally discriminates between groups of persons." *SECSYS*, 666 F.3d at 685; *see also Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) (a plaintiff "must first make a threshold showing that [she was] treated differently from others who were similarly situated to [her]"). When the distinction between groups of persons is apparent on the face of the challenged statute or state action, "an intent to discriminate is presumed and no further examination of legislative purpose is required." *Id.* When the law is generally applicable to all persons, however, the plaintiff bears the burden of establishing "'the existence of purposeful discrimination' causing an adverse effect." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (citing *McCleskey v. Kemp*, 481 U.S. 279, 292

(1987)). Disparate impact alone is insufficient to establish intentional or purposeful discrimination, "because many laws, perhaps most and often unavoidably, affect some groups of persons differently than others . . . ." *SECSYS*, 666 F.3d at 685. At the dismissal stage, a plaintiff's factual averments must be "at least susceptible of an inference of discriminatory intent." *Ingram v. Cooper*, 163 F. Supp. 3d 1133, 1139 (N.D. Okla. 2016) (citation omitted).

Once a plaintiff overcomes this threshold burden, he or she must establish the state's intentional discrimination is not "justified by reference to some upright government purpose." *SECSYS*, 666 F.3d at 686. Here, courts presume the relevant legislation is "valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex.*, 473 U.S. at 440. Only when a plaintiff establishes the intentional discrimination targets a fundamental right or a suspect classification does a heightened standard of review apply. *Id.*

A.    **Plaintiffs fail to allege any set of facts to establish the Oklahoma Birth Certificate Law purposefully discriminates between groups of people.**

The Birth Certificate Law governing amendments to birth certificates contains no facial classifications. Title 63, Section 1-321 provides a uniform process generally applicable to all individuals seeking to amend their birth certificates. It makes no distinction between the process based on sex or any other classification. The Executive Order likewise does not distinguish between the birth certificate amendment process based on sex or any other classification. *See* Exec. Order No. 2021-24 (Nov. 8, 2021). The prohibition against "alter[ing] a person's sex or gender on a birth certificate[]" applies equally to men and women. *Id.* at 1.

Given the absence of any distinction between groups of people evident on the face of the relevant laws, "no presumption of intentional discrimination arises; proof is required." *SECYS, LLC,* 666 F.3d at 685. Yet, Plaintiffs' Complaint is devoid of any factual assertion that plausibly establishes a disparate impact on a class of persons—men, women, or even transgender individuals—let alone that the State intentionally discriminated against that class of persons as a facial matter. Plaintiffs'

conclusory declarations that the State "facially and intentionally discriminates against transgender people . . ." and "on the basis of transgender status . . ." are insufficient to establish any disparate impact on transgender individuals as a class. Doc 21. at ¶¶ 126-127; *see also Iqbal*, 556 U.S. at 678-679.[9]

Plaintiffs' theory of equal protection proves too much because it recasts almost every neutral law as facially discriminatory. Facially neutral laws always have greater impact on people who want to violate or change those laws, but this impact does not make a law facially discriminatory. In Plaintiffs' view, a law that prohibits birth certificate amendments discriminates against people who want amendments. By the same reasoning, as an example, the rules against swimming in Lake Hefner are facially discriminatory against people who can swim. Perhaps swimmers chafe under the swimming rules more than non-swimmers, just as transgender people chafe under the amendment rules more than people who do not seek amendments. Nevertheless, the existence of people experiencing greater impact from the law does not convert the neutral law into a discriminatory one. Nor does the fact an individual is transgender, any more than a swimmer, entitle them to special exemptions from neutral laws. To conclude otherwise would be to establish a rule that almost all statutes are discriminatory.

Plaintiffs plead nothing besides this novel impact theory to make their equal protection claim succeed. Plaintiffs don't allege, for example, that men, women, or transgender individuals as a class are being treated differently than others in the amendment application process or in the denials issued under the law. Although Plaintiffs do allege they have been denied amendments, they fail to plead any facts to suggest Oklahoma is approving other applications under the current law and Executive Order. Doc. 21 at ¶¶ 76, 97, 112. Plaintiffs don't allege, for example, the State is applying the law in discriminatory fashion, implementing two different sets of standards, or denying one group a benefit while allowing others access. *See, e.g., Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 537-

---

[9] For example, it is far from obvious transgender individuals as a class share Plaintiffs' crusade to erase sex. After all, birth sex is fundamental to and inseparable from transgender status. *See infra* Part II(B).

538 (1982). Instead, Plaintiffs allege nothing more than a non-discriminate and equally applied policy that *they don't like*. This does not establish discrimination through disparate impact.

Even if the fact Plaintiffs want a contrary state law was sufficient to establish disparate impact under the Fourteenth Amendment, Plaintiffs' Complaint also fails to establish the State intentionally discriminated against transgender individuals. *See Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 42 (2012) ("Although disparate impact may be relevant evidence of ... discrimination ... such evidence alone is insufficient [to prove a constitutional violation] even where the Fourteenth Amendment subjects state action to strict scrutiny." (citation omitted)). Plaintiffs fail to allege any set of facts to support some discriminatory intent behind 63 O.S. § 1-321 or its recent amendment through S.B. 1100, 2022 O.S.L. 87. Outside of Plaintiffs' conclusory allegations and incorrect statements of law, Plaintiffs cite only a single factual allegation potentially related to the intent behind the Executive Order: a statement from the Governor in the weeks before the issuance of the Executive Order. *Compare* Doc. 21 at ¶¶ 126-127 *to* ¶ 53. Specifically, the Governor declared that "people are created by God to be male or female. Period." *Id.* at ¶ 53. If any underlying intent could be garnered from this statement, it is an intent that Oklahoma birth certificates continue recording biological sex at birth. In other words, Plaintiffs identify an intent to accurately classify individuals based on sex. But, again, "[c]lassification is not discrimination." *Caskey Baking Co. v. Virginia*, 313 U.S. 117, 121 (1941); *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Sex classifications may be used to compensate women for particular economic disabilities [they have] suffered, to promot[e] equal employment opportunity, to advance full development of the talent and capacities of our Nation's people." (citations omitted)); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920) ("[T]he 'equal protection of the laws' required by the Fourteenth Amendment does not prevent the states from resorting to classification

for the purposes of legislation. Numerous and familiar decisions of this court establish that they have a wide range of discretion in that regard.").[10]

In sum, even if the State's refusal to alter state-issued certifications of a person's birth sex has some sort of disparate impact on transgender individuals, Plaintiffs fail to plead any set of facts to establish discriminatory intent behind that refusal. *See SECSYS*, 666 F.3d at 685-86. Because Plaintiffs cannot establish purposeful discrimination, dismissal is proper.

> **B.     Plaintiffs fail to provide any set of facts to establish the Oklahoma Birth Certificate Law purposefully discriminates against a suspect class.**

Even if Plaintiffs could overcome their first hurdle of establishing that the State purposefully discriminated against transgender individuals as a class, transgender status is not, as a matter of law, a suspect classification under the Equal Protection Clause.

To start, no binding authority has ever held that "transgender status" or "gender identity" is an independently suspect class under the Fourteenth Amendment. The Tenth Circuit confirmed this as recently as 2015:

> To date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims. *See Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227–28 (10th Cir.2007) (denying suspect-classification equal-protection employment rights for transgendered employees); *Brown v. Zavaras*, 63 F.3d 967, 972 (10th Cir.1995) (affirming the dismissal of an equal protection claim alleging the denial of estrogen treatment to a transsexual prisoner).

*Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (unpublished).

Indeed, the Supreme Court recently confirmed that transgender status is not sex in *Bostock v. Clayton Co*, 140 S. Ct. 1731 (2020). In analyzing whether the sex-based protections of Title VII prohibited employment discrimination against homosexual or transgender individuals, the Court built its opinion on the foundational fact that "sex" referred "only to biological distinctions between male

---

[10] Moreover, Plaintiffs do *not* challenge the State's decision to limit sex classifications to male and female.

and female." *Id.* at 1739. The Court then concluded that an employer's discrimination against an employee based on homosexual or transgender status violates Title VII because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 1741. The Court held that discrimination against transgender persons is discrimination against individuals whose "sex identified at birth" does not match their identity today. *Id.* at 1746 (emphasis added). The Court further explained:

> We agree that homosexuality and **transgender status are distinct concepts from sex**. But, as we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.

*Id.* at 1746–47 (emphasis added). Put differently, the reason the *Bostock* Court found transgender status fell within the protections of Title VII is because a transgender individual's subjective gender identity *differs* from his or her sex.[11]

In sum, any conceivable equal protection theory based on transgender status rests upon a *sex-based* classification where gender identity is different from sex. *See, e.g., id.* at 1747 ("[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second."); *Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) ("In the wake of Bostock, it is now clear that transgender discrimination, like that complained of by Dr. Tudor, is discrimination 'because of sex' prohibited under Title VII."). The irony (and downfall) of Plaintiffs' invocation of sex-based discrimination here, however, is that it requires

---

[11] Plaintiffs appear to agree with this by regularly relying on the concept of gender identity and referring to "gender identity" over one-hundred times in their Complaint. *See, e.g.,* Doc. 21 at ¶¶ 20-33. For example, Plaintiffs acknowledge that "[t]ransgender persons are people whose gender identity diverges from the sex they were assigned at birth[,]" *Id.* at ¶ 23, and that "transgender status" is "inextricably linked to a person's sex[,]" *Id.* at ¶ 21. At the same time, Plaintiffs regularly conflate gender identity with sex, suggesting gender identity *is* sex and manufacturing a distinction between sex and *birth* sex. *See, e.g., id.* at ¶¶ 20-25.

objective sex to yield entirely to subjective gender identity—a position that would obliterate the very sex-based classifications upon which equal protection is predicated in the first place.

Even before *Bostock*, the Supreme Court long recognized that "sex, like race and national origin, is an immutable characteristic." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). After all, "[p]hysical differences between men and women . . . are enduring: '[t]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citing *Ballard v. United States*, 329 U.S. 187, 193 (1946)). As a result, the Supreme Court has explained: "[t]o fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001). In other words, the distinction between men and women is a real one, and "the principle of equal protection does not forbid Congress to address" problems in a way specific to each sex. *Id.*

The invidious nature of some statutory classifications based on sex does not render sex classifications altogether disposable. The Equal Protection Clause does not aim to eliminate "dispositive realities" of sex, only assumptions, stereotypes, and over-broad generalizations about the tendencies or preferences of men or women. *Virginia*, 518 U.S. at 549-50; *see also Michael M. v. Superior Court of Sonoma Cty.*, 450 U.S. 464, 469 (1981) ("Underlying these decisions is the principle that a legislature may not 'make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class.'" (citation omitted)).

Today, "'[i]nherent differences' between men and women, we have come to appreciate, remain cause for celebration . . . ." *Virginia*, 518 U.S. at 533. Consistent with the same, the Supreme Court has declined to adopt strict scrutiny to evaluate sex classifications and has not hesitated to uphold sex

classifications "used to compensate women 'for particular economic disabilities [they have] suffered,' . . . to 'promot[e] equal employment opportunity,' . . . to advance full development of the talent and capacities of our Nation's people." *Id.* (internal citations omitted). *Bostock* reiterated that sex stereotyping in the workplace is impermissible by maintaining that birth sex is an identifiable concept separate from gender identity. 140 S. Ct. at 1746-47.

At the foundation of this wealth of equal protection precedent, then, is a deeply rooted understanding of the natural distinction between men and women as biological sexes and a prohibition against stereotyping based on the immutability of the two sexes. Time and time again, the Supreme Court has recognized the binary and biological nature of the *two* sexes: between male and female or man and woman. *See, e.g., Virginia*, 518 U.S. at 533 (identifying "[t]he two sexes . . . ."); *Michael M.*, 450 U.S. at 471 (recognizing "[o]nly women may become pregnant . . . ."). Only by recognizing the distinction between sexes could the Supreme Court strike down stereotypical and invidious sex discrimination and safeguard the rights of women. *See, e.g., Michael M.*, 450 U.S. at 469 ("[T]his Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances.").

Importantly, *Bostock* also stressed that its narrow holding only answered whether adverse employment actions based entirely on a person being homosexual or transgender violated Title VII, clarifying its opinion did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S. Ct. at 1753. For good reason: such laws, like the birth certificate law at issue here, simply and permissibly classify individuals based on biological or birth sex. *Cf. Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."). To invalidate a sex-based classification in any of these contexts because it "discriminates" against

transgender persons is to destroy sex-based classifications altogether—to conflate sex with subjective gender identity. That is not what the Supreme Court has ever authorized or ordered.

Numerous authorities have detected the havoc conflating sex with subjective gender identity would wreak in the context of laws separating the two sexes based on real and significant physical differences.  As the Tenth Circuit emphasized in discussing sex-based classifications in restrooms, requiring "employees use restrooms matching their biological sex does not expose biological males to disadvantageous terms and does not discriminate against employees who fail to conform to gender stereotypes . . . ." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1225 (10th Cir. 2007), *overruled in part on other grounds in Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021); *see also Carcaño v. McCrory*, 203 F. Supp. 3d 615, 645 (M.D.N.C. 2016).

In the context of sex-based classifications in athletic activities, the Sixth Circuit highlighted:

> it must be apparent that its basis is the distinct differences in physical characteristics and capabilities between the sexes . . . . It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.

*Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated in part in Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 190 F.3d 705, 706 (6th Cir. 1999).  Other courts have likewise noted the distinction between discrimination based on sex and sexual or gender identity. *See, e.g., Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) ("[A] prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's sexual identity disorder or discontent with the sex into which they were born."); *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 671 (W.D. Pa. 2015) ("Thus, while Plaintiff might identify his gender as male, his birth sex is female. It is this fact—that Plaintiff was born a biological female, as alleged in the complaint—that is fatal to Plaintiff's sex discrimination claim.").

Plaintiffs' Equal Protection claim discards all of this authority.  Plaintiffs repeatedly conflate sex with subjective gender identity to assert the Birth Certificate Law discriminates "based on sex as well as discriminat[es] based on transgender status . . . ." Doc. 21 at ¶ 125. Plaintiffs contend Oklahoma's law interferes with the goal of transgender persons "to live in a manner consistent with their gender identity, rather than their sex assigned at birth . . . ." *Id.* at ¶ 30; *see also id.* at ¶¶ 23, 25-37. While conflating biological or birth sex with gender identity throughout their Complaint, Plaintiffs also repeatedly separate the concepts, using the phrase "gender identity" over 100 times and even conceding "[t]he various components associated with transition . . . do not change a person's sex . . . ." *Id.* at ¶ 35. Critically, Plaintiffs characterize Oklahoma's Birth Certificate Law as "depriving transgender people of birth certificates that match their gender identity" and of "being able to possess identity documents consistent with a person's gender identity . . . ." *Id.* at ¶¶ 37, 36; *see also* ¶¶ 38, 41, 42-43, 48, 66, 76-77, 80, 87, 97-98, 100, 102, 112-113, 115, 121, 126-127, 129(c)-(d).  The inconsistencies in the Complaint only confirm the true issue here: there is no sex-based discrimination at issue, and Plaintiffs cannot prevail unless this Court substitutes sex for subjective gender identity.

Because subjective gender identity alone is not a suspect class, because Plaintiffs' claim does not rely on any sex-based discrimination, and because any such reliance would not be actionable, Plaintiffs fail to establish the Birth Certificate Law purposefully discriminates against anyone, let alone against any suspect class. This Court should dismiss Plaintiffs' Count I and uphold Oklahoma's law.

### C.     *The Oklahoma Birth Certificate Law survives rational basis review.*

The Court need not reach the question of state interests on a facially neutral law. *See supra* Part II(A). Nevertheless, if the Court adopts Plaintiffs' novel impact theory, any "classification" in denying amendments in the Oklahoma Birth Certificate Law "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). Under rational basis review, courts

do not sit "to judge the wisdom, fairness, or logic of legislative choices." *Id.* (citation omitted). A state need only articulate some "conceivable basis" supporting the law, "whether or not the basis has a foundation in the record." *Id.* at 320-321. "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. '[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.'" *Id.* at 320 (citation omitted).

Despite Plaintiffs' glib assertion that the Birth Certificate Law "is not supported by any . . . legitimate government interest[,]" and lacks "even rational relationship to a valid government interest," Doc. 23 at ¶¶ 63-64, the law furthers *at least* two state interests: (1) protecting the integrity and accuracy of vital records, including by documenting birth information and classifying individuals based on the two sexes,[12] and (2) using those classifications to protect the interests of women. The government practice of recording vital statistics on birth, including sex, is a well-established practice undertaken by state and local governments throughout history. *See supra* Background. Oklahoma's Birth Certificate Law confirms the objective amendment process is designed "to protect the integrity and accuracy of vital statistics records." 63 O.S. § 1-321(A). In addition, there can be no serious dispute that the protection of bodily privacy from the opposite sex is an important governmental interest. *See, e.g., Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993); *Doe v. Luzerne Cty.*, 660 F.3d 169, 176-77 (3d Cir. 2011); *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963); *see also supra* Part II(B). Government entities, schools, and third parties commonly use birth certificates to apply laws and policies protecting privacy interest based on the physiological differences in men and women. This interest is furthered by

---

[12] Plaintiffs are wrong to suggest previous compliance with court orders on matters of state law surrendered any state interests, *see supra* Background, as no authority supports that proposition.

maintaining accurate classifications based on biological and physiological sex, including through birth certificates.[13]

Again, the Court need not reach these considerations because Plaintiffs' equal protection claim cannot stand against a facially neutral law. *See supra* Part II(A). But even under Plaintiffs' novel impact theory of discrimination, the "classification" is rational.

## III. PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER SUBSTANTIVE DUE PROCESS (COUNT II).

Plaintiffs' substantive due process claim cannot survive as a matter of law because Plaintiffs cannot identify a fundamental right that Defendants infringed. *See* Doc. 21 at ¶¶ 131-138.

The Fourteenth Amendment's Due Process Clause protects two categories of substantive rights: those guaranteed by the first eight amendments, and "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). In deciding whether a right falls into either of these categories, the Supreme Court "has long asked whether the right is 'deeply rooted in [our] history and tradition' and whether it is essential to our Nation's 'scheme of ordered liberty'" *Id.* (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 686 (2019)). In *Dobbs*, the Court pointed to *Timbs* as an emblematic example of how to conduct such an examination. *Id.* There, the Court held that the protection against excessive fines was "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition" by tracing

---

[13] The State's interest in classifying based on biological and physiological sex, as well as the Supreme Court precedent recognizing physiological differences between the sexes, is not diminished by medical intervention attempting to "bring a person's physical appearance and lived experience into better alignment with their . . . gender identity." Doc. 21 at ¶ 35. As other courts have recognized:

> A male-to-female post-operative transsexual does not fit the definition of a female. The male organs have been removed, but the ability to "produce ova and bear offspring" does not and never did exist. There is no womb, cervix, or ovaries, nor is there any change in his chromosomes. As the *Littleton* court noted, the transsexual still "inhabits ... a male body in all aspects other than what the physicians have supplied."

*In re Estate of Gardiner*, 42 P.3d 120, 135 (Kan. 2002) (*citing Littleton v. Prange*, 9 S.W.3d 223, 231 (Tex. App. 1999)); *see also Anonymous v. Anonymous*, 325 N.Y.S.2d 499, 500 (N.Y. Sup. Ct. 1971).

back to the Magna Carta, Blackstone's Commentaries, and 35 of the 37 state constitutions in effect at the ratification of the Fourteenth Amendment. *Id.* at 2246–2247 (citing *Timbs*, 139 S. Ct. at 687–690).

A historical examination is necessary when a court is asked to recognize a new component of the "liberty" protected by the Due Process Clause because "the term 'liberty' alone provides little guidance." *Id.* at 2247. And the Supreme Court has stated that "[w]e must … exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

The Tenth Circuit has previously held that substantive due process can be violated either by legislative acts infringing on a fundamental right without a compelling governmental purpose or executive action depriving "a person of life, liberty, or property in a manner so arbitrary as to shock the judicial conscience." . . . ." *Lindsey v. Hyler*, 918 F.3d 1109, 1115 (10th Cir. 2019). The arbitrary or conscience-shocking standard "is exacting." *Id.* at 1116. "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense . . ." and there must be "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience-shocking." *Id.* (citation omitted). To the extent any right to informational privacy exists at all,[14] governmental disclosures of private or medical information "are prohibited only when they shock the conscience." *Leiser v. Moore*, 903 F.3d 1137, 1144 (10th Cir. 2018).

---

[14] The Supreme Court has never affirmatively recognized or explained the right, *see NASA v. Nelson*, 562 U.S. 134, 147 (2011); *see also id.* at 161 (Scalia, J., concurring), and has never found any undefined right to informational privacy was violated. *See, e.g., id.* at 147, 159; *Whalen v. Roe*, 429 U.S. 589, 591, 597-98, 603-04 (1977); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 455, 458-59, 464-65 (1977). Accordingly, the Tenth Circuit recently questioned whether a right to informational privacy exists at all, noting "it can no longer be said in the context of government disclosure of information that '[t]here is no dispute that confidential medical information is entitled to constitutional privacy protection.'" *Leiser v. Moore*, 903 F.3d 1137, 1144 (10th Cir. 2018).

Plaintiffs allege two different substantive due process claims: first, that the right to privacy includes the freedom from involuntary disclosure of transgender status, and second, that there is a right to define and express one's gender identity and to be treated in a manner consistent with a person's gender identity by the government. *See* Doc. 21 at ¶¶ 136-139. For the first claim, biological sex is not the type of confidential, personal, or medical information entitled to protection against governmental disclosure under the Fourteenth Amendment. *See, e.g., supra* Part II(C). Nor does governmental disclosure of an individual's biological or birth sex—or indirectly transgender status— implicate any fundamental right deeply rooted in the Nation's history. *Cf.* Background. Additionally, inclusion of biological sex on state records, such as birth certificates, does not shock the conscience. Finally, and in any event, Plaintiffs fail to establish any governmental disclosure of their biological sex, let alone transgender status. *See infra* Part IV.[15]

The only government action at issue here is the State's inclusion of (and refusal to amend) birth sex on a birth certificate. That, by itself, is not disclosure by the State to a third-party. Instead, any disclosure at issue comes from Plaintiffs, not the State. For example, in their Complaint Plaintiffs identify a number of examples of disclosures involving driver's licenses—none of which involve *the State* as the disclosing party, or even involve birth certificates. *See* Doc. 21 at pp. 26-27. Plaintiffs also concede that they could have their driver's license reflect gender identity, *id.* at ¶¶ 60, 96, without explaining how maintaining birth sex on a birth certificate causes a disclosure issue. These factual circumstances stand in stark contrast to those involving a government official directly informing third parties of a plaintiff's personal information, such as the plaintiff's HIV diagnosis in *Herring v. Keenan*, 218 F.3d 1171, 1173 (10th Cir. 2000) or cancer diagnosis in *Leiser*, 903 F.3d at 1138.

---

[15] The absurdity and sweep of Plaintiffs' claim is illustrated by their insistence that even *keeping a record* of their sex assigned at birth, or a "revision history", somehow violates their constitutional rights. Doc 21 at ¶¶ 610-643, pp. 32-33 ¶ B-C.

In addition, the only disclosure at issue here is that of birth or biological sex. To the extent transgender status is disclosed because of the inclusion of (and refusal to amend) birth sex on government-issued records because transgender status is inextricably tied to sex, it is through *indirect* assumptions, inferences, and inclusions made based on extraneous circumstances such as the transgender individual's statements, mannerisms, or appearance. None of these intervening circumstances involve the State directly disclosing Plaintiffs' transgender status to third parties.

On the other hand, many authorities recognize a right to bodily privacy in places such as bathrooms and changing facilities. *See supra* Part II(C). Any unidentifiable informational privacy interest Plaintiffs may claim is eclipsed by this countervailing privacy interest, which can only be preserved by maintaining accurate sex classifications. Recognizing some right to privacy of birth sex would ironically eviscerate privacy rights based on biological sex, as women cannot have bodily privacy without a disclosed classification based on sex.

With regards to the second claim, Plaintiffs fail to establish that the right to express one's own gender identity and to be treated in a manner consistent with a person's gender identity by the government is "deeply rooted in [our] history and tradition" and "essential to our Nation's scheme of ordered liberty." *Dobbs*, 142 S. Ct. at 2246 (citation omitted). The Complaint alleges that OSDH allowed transgender people to change the gender markers on their birth certificates for "several years" and that the practice is currently followed in many but not all states, Doc. 21 at ¶¶ 50, 58, but crucially, nothing in the complaint even suggests that there is a deeply rooted historical basis for this right. That is because there is not one. *See* Background. Recent practices do not establish a deeply rooted liberty interest. Because Plaintiffs cannot identify any governmental interference with a fundamental right, nor any application of the law that shocks the conscience, dismissal is proper as a matter of law.

IV.   **PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER THE FIRST AMENDMENT (COUNT III).**

Plaintiffs claim that the Birth Certificate Law violates the Free Speech Clause of the First Amendment under the novel theory that the State's recording of (and refusal to amend) birth sex on a birth certificate forces Plaintiffs "to endorse the government's position as to their own gender," and "disclose their transgender status" when they show the same to third persons. *See* Doc. 21 at ¶¶ 142-143. Plaintiffs' claims cannot survive as a matter of law. The Birth Certificate Law does not implicate, let alone violate, any free speech rights of Plaintiffs and a birth certificate constitutes purely governmental speech.

The Free Speech Clause of the Constitution protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). But when the government speaks, it "has the right to 'speak for itself[,]'" and "is entitled to say what it wishes . . . ." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (citations omitted). The Free Speech Clause therefore does not restrain the government's freedom to determine the content of what it says or chooses not to say. *Id.* at 467-68; *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Otherwise, "government would not work." *Walker*, 576 U.S. at 207; *see also Shurtleff v. City of Boston, Massachusetts*, 142 S. Ct. 1583, 1589 (2022).

In evaluating whether the relevant expressive conduct is a form of government speech or provides a forum for private speech, courts must consider factors including: (1) whether the medium has historically been used for government speech, (2) whether the public observer would interpret the speech as being conveyed by the government, and (3) whether the government has maintained control over the speech. *See Walker*, 576 U.S. at 209-210; *Shurtleff*, 142 S. Ct. at 1589-1590. Pursuant to this analysis, the Supreme Court of the United States has concluded, for example, that license plates convey government speech. *See Walker*, 576 U.S. at 209-214.

In *Walker*, the Supreme Court reasoned that license plate designs have a robust history of use to communicate various governmental messages, are closely identified in the public mind with the state, and are controlled directly and solely by the state. *Id.* at 212-213. The Supreme Court emphasized that "[t]he governmental nature of the plates is clear from their faces"—from the governmental purpose they serve (vehicle registration and ID) to the placement of the state name in large letters to the state's comprehensive control over their designs, issuance, and disposal. *Id.* at 212. Going further, the Supreme Court analogized license plates to *government IDs*, explaining:

> issuers of ID "typically do not permit" the placement on their IDs of "message[s] with which they do not wish to be associated." *Summum*, 555 U.S., at 471, 129 S.Ct. 1125. Consequently, "persons who observe" designs on IDs "routinely—and reasonably—interpret them as conveying some message on the [issuer's] behalf." *Ibid.*

*Id.*[16] The fact private parties took part in the design of those messages on the license plate did "not extinguish the government nature of the message . . . ." *Id.* at 217.

Here, as with the license plate in *Walker*, the state-issued birth certificate is government speech—not a public forum of any sort. A certificate of birth is a vital record registering a birth and recording certain personal information related thereto, a statement of facts concerning an individual, and a permanent legal record. *See supra* pp. 2-3. The governmental nature of a birth certificate is evident in its purpose, function, and official custodian. *See, e.g., id.* The governmental nature of a birth certificate is also evident on its face: from the uniform format and information contained thereon to the identification of "OKLAHOMA" across the top. *See* Example Oklahoma Birth Certificate, attached as Exhibit 1. As a government-issued record, a public observer would associate any message conveyed on a birth certificate with the State.

---

[16] The Court further clarified that in contrast to the public parks at issue in *Summum*, "license plates are not traditional public forums for private speech[,]" and therefore "forum analysis is misplaced here." *Id.* at 214, 215.

Moreover, unlike the specialty license plates at issue in *Walker*, private parties do not select the design or the categories of information reported on the birth certificate. The State alone decides the style, form, and information required to be reported on the birth certificate. The private parties merely supply some of the personal information required to the State. But the information provided is objective, and the certifying parties attest to the accuracy of the same. *See* 63 O. S. § 1-311(E). More importantly, the individual identified in the birth certificate plays **no role whatsoever** in the submission of personal information. *See* 63 O. S. § 1-311(B). He or she is not speaking at all, in any manner, having just been born.

Because an Oklahoma birth certificate and its contents are purely government speech, the Birth Certificate Law does not compel private individuals to speak in violation of the First Amendment. And just as the State cannot compel Plaintiffs to convey the State's ideological message in Plaintiffs' private speech, Plaintiffs cannot compel the State to convey their ideological message in the State's own records. *See Walker*, 576 U.S. at 219.

In addition, a birth certificate does not express any ideological message, nor compel a private party to express a view with which they disagree. *Cf. Walker*, 576 U.S. at 219 (collecting cases); *see also United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) ("Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views . . . ."). It is a governmental record registering and certifying simple factual information associated with an individual at the time of his or her birth, including an individual's biological sex. *See supra* Part II(C)(i); Background. The sex reported on a state-issued birth certificate is a certifiable fact. *See* 63 O.S. §§ 1-311, 1-321; 28 U.S.C. § 1739; Fed. R. Civ. P. 44; Fed. R. Evid. 201. Indeed, "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women . . .

23

are enduring: '[t]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'" (citation omitted)). Plaintiffs concede that the State birth certificates record biological sex assessed at birth, Doc. 21 at ¶ 18, and admit they are asserting feelings about gender identity, not disputing the accuracy of their biological sex recorded at birth, *id.* ¶ 23, 69, 91, 106.

Biological or birth sex is not an ideological message, nor is it the type of "personal information of the utmost intimacy[.]" *Coe v. U.S. Dist. Court for Dist. of Colorado*, 676 F.2d 411, 416 (10th Cir. 1982) (collecting example cases involving birth control, abortion, homosexuality, sodomy, illegitimate children, abandoned families, etc.) (quoting *Southern Methodist University Ass'n v. Wynne & Jaffe*, 599 F.2d 707 (5th Cir. 1979)). As evidenced in the very government document in dispute here, an individual's sex is disclosed and recorded almost immediately after birth. Biological or birth sex is not the type of confidential information that remains private, subject to disclosure controlled by the individual. By extension, neither is the fact someone presents themselves as a different gender from their birth sex.

That the categories of information contained on a birth certificate, including sex, may carry subjective personal importance to an individual later in life does not alter the administerial and governmental nature of any message contained thereon. Although sex may feel inherently personal to the individual, so could a person's name, birth date, address, height, weight, eye-color, and other like information routinely disclosed to the government or contained on government records. The personal importance of the information does not, without more, convert it into private speech.

The inclusion of sex on state-issued identification is so well-established, in fact, that it is often required by *federal* law. For example, the federal REAL ID ACT of 2005 *requires* a state-issued driver's license to include a sex/gender marker, "as determined by the State." 6 C.F.R. § 37.17(b); *see also* 8 C.F.R. § 274a.2(b)(v)(B)(1) (requiring employment verification through identification cards or driver's licenses including "identifying information" such as "name, date of birth, sex, height, color of eyes,

and address"). Individuals also regularly reveal their sex with the public and government officials, whether through social media, licensing or registration, financial applications, etc. *See, e.g.,* Doc. 21 at ¶ 121. Because identifying information, such as sex, is so readily and regularly disclosed, the inclusion of the same on a government record does not compel a private party to express a view with which they disagree, nor invade their private speech.[17] This Court should dismiss Plaintiffs' Count III.

## CONCLUSION

For the many reasons stated herein, Plaintiffs constitutional claims fail as a matter of law. In the absence of any plausible claim that Oklahoma's Birth Certificate Law violates the U.S. Constitution, it "is a matter of public policy to be decided by the [state] legislature" that must be upheld. *K. v. Health Div., Dep't of Human Res.*, 560 P.2d 1070, 1072 (Or. 1977); *see also Hartin v. Dir. of Bureau of Records & Statistics, Dep't of Health of City of New York*, 347 N.Y.S.2d 515, 518 (N.Y. Sup. Ct. 1973). For these reasons, Defendants respectfully this Court dismiss the Complaint in its entirety and grant Defendants all other and further relief as the Court deems appropriate.

---

[17] Plaintiffs' First Amendment claim is so vaguely stated, that is unclear whether Plaintiffs argue that their own requested relief—ordering the State to issue *changed* or issue "*corrected* birth certificates . . . accurately reflecting . . . gender identity"—involves compelled disclosure of transgender status to the State. *Id.* at p. 33. Such a claim would be particularly indefensible, because in order to *change* the personal information on state records, an individual *must* disclose that change.

Respectfully submitted,

s/ *Audrey A. Weaver*
ZACH WEST, OBA #30768
 *Solicitor General*
BRYAN CLEVELAND, OBA #33860
 *Deputy Solicitor General*
AUDREY A. WEAVER, OBA #33258
 *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Zach.west@oag.ok.gov
Bryan.cleveland@oag.ok.gov
Audrey.weaver@oag.ok.gov
*Counsel for Defendants*

26

CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of August, 2022, I electronically transmitted the foregoing

document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of

Electronic Filing to the ECF registrants with entries of appearance filed of record.

s/ *Audrey A. Weaver*
Audrey A. Weaver