# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ROWAN FOWLER; ALLISTER HALL; and
C.R.,

       *Plaintiffs*,

   v.

KEVIN STITT, in his official capacity as
Governor of the State of Oklahoma; KEITH
REED, in his official capacity as Commissioner
of Health for the Oklahoma State Department of
Health; and KELLY BAKER, in her official
capacity as State Registrar of Vital Records,

       *Defendants*.

Case No.: 22-CV-00115-GKF-SH

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Submitted by:

Shelly L. Skeen*
Nicholas Guillory*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Ave, Ste. 500
Dallas, TX 75219
(214) 219-8585
sskeen@lambdalegal.org
nguillory@lambdalegal.org

Peter C. Renn*
Christina S. Paek*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Ste. 280
Los Angeles, CA 90010
Telephone: (213) 382-7600
prenn@lambdalegal.org
cpaek@lambdalegal.org

Karen Keith Wilkins, OBA# 21005
1515 S. Denver Ave.
Tulsa, OK 74119
 (918) 599-8118
karen@wilkinslawtulsa.com

*Admitted *pro hac vice*

September 30, 2022

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND....................................................................................................2

ARGUMENT ...........................................................................................................................3

I.      Defendants' Birth Certificate Policy Violates the Equal Protection Clause........................3

        A.      The Policy Triggers Heightened Scrutiny Because It Discriminates
               Based on Sex and Transgender Status. ...................................................................3

               1.      The Policy Engages in Sex-Based Discrimination. ....................................5

               2.      The Policy Discriminates Against Transgender People, Who Constitute
                      A Suspect Class..........................................................................................10

        B.      The Policy Fails Even Rational Basis Review.......................................................12

II.     The Policy Violates the Due Process Clause by Infringing Privacy and Liberty. ..............16

        A.      The Policy Violates Plaintiffs' Right to Informational Privacy.............................16

        B.      The Policy Burdens Plaintiffs' Rights to Liberty, Autonomy, and Dignity. ..........19

III.    The Policy Violates Transgender People's First Amendment Rights to Free Speech........21

        A.      Gender Markers on Birth Certificates Do Not Constitute Government Speech
               Because They Are Attributed to the Individual, Not the Government. .................21

        B.      The Policy Compels Plaintiffs to Endorse the State's Message About Their
               Gender and Prohibits Them From Conveying Their Own Protected Message. ....24

CONCLUSION.......................................................................................................................25

CERTIFICATE OF SERVICE ...............................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015)..............................................................11, 17

*Anderson v. Blake*,
469 F.3d 910 (10th Cir. 2006) ...........................................................................17

*Arroyo Gonzalez v. Rosello Nevares*,
305 F. Supp. 3d 327 (D.P.R. 2018)........................................................5, 13, 17, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................23

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) ..........................................................................25

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) ..........................................................................................25

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) .................................................................11

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) .....................................................................................6, 7

*Botello v. Morgan Hill Unified Sch. Dist.*,
No. C09-02121 HRL, 2009 WL 3918930 (N.D. Cal. Nov. 18, 2009) ...................18

*Corbitt v. Taylor*,
513 F. Supp. 3d 1309 (M.D. Ala. 2021) ....................................................5, 7, 9, 13

*Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015) ...........................................................................22

*Dalton v. Reynolds*,
2 F.4th 1300 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 348 (2021) ......................12

*Doe v. Bell*,
754 N.Y.S.2d 846 (Sup. Ct. 2003)......................................................................25

*D.T. v. Christ*,
552 F. Supp. 3d 888 (D. Ariz. 2021) .........................................................5, 7, 21

*Eastwood v. Dep't of Corrs.*,
    846 F.2d 627 (10th Cir. 1988) ...........................................................16

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018) ..........................................................9, 10

*Eknes-Tucker v. Marshall*,
    -- F. Supp. 3d --, 2022 WL 1521889 (M.D. Ala. 2022)........................21

*Evancho v. Pine-Richland Sch. Dist.*,
    237 F. Supp. 3d 267 (W.D. Pa. 2017) ...............................................11

*Fabian v. Hosp. of Cent. Conn.*,
    172 F. Supp. 3d 509 (D. Conn. 2016) ..............................................9, 10

*Flack v. Wis. Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ...............................................11

*Fletcher v. Alaska*,
    443 F. Supp. 3d 1024 (D. Alaska 2020) ................................................6

*Foster v. Andersen*,
    No. 18-2552, 2019 WL 329548 (D. Kan. Jan. 25, 2019).......................11

*Foster v. Andersen*,
    No. 18-2552, ECF No. 33 (D. Kan. Jun. 21, 2019) ................................4

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
    916 F.3d 792 (10th Cir. 2019) .........................................4, 9, 10, 14, 15

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)...........................................................................15

*F.V. v. Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018) ..............................4, 7, 8, 11, 13

*Golinski v. U.S. Off. of Pers. Mgmt.*,
    824 F. Supp. 2d 968 (N.D. Cal. 2012) ...............................................12

*Grimes v. County of Cook*,
    455 F. Supp. 3d 630 (N.D. Ill. 2020) .................................................18

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ...................................................5, 8, 11

*Heller v. Doe*,
    509 U.S. 312 (1993) ................................................................................................14

*Herring v. Keenan*,
    218 F.3d 1171 (10th Cir. 2000) ............................................................................16

*In re Tam*,
    808 F.3d 1321 (Fed. Cir. 2015) .............................................................................24

*Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*,
    138 S. Ct. 2448 (2018) ...........................................................................................24

*Kadel v. Folwell*,
    No. 1:19CV272, 2022 WL 3226731 (M.D.N.C. Aug. 10, 2022) .............................5

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ...............................................................................11

*Kitchen v. Herbert*,
    755 F.3d 1193 (10th Cir. 2014) .......................................................................12, 20

*K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*,
    No. 3AN-11-05431-CI, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) ...........5, 13, 18

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ................................................................................................19

*Leiser v. Moore*,
    903 F.3d 1137 (10th Cir. 2018) .............................................................................18

*Love v. Johnson*,
    146 F. Supp. 3d 848 (E.D. Mich. 2015) ...........................................................5, 13, 17, 18

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
    286 F. Supp. 3d 704 (D. Md. 2018) ......................................................................11

*Marquez v. Montana*,
    No. DV-21-873 (Yellowstone Cnty. Dist. Apr. 21, 2022) ..................................5, 21

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ......................................................................................23, 24

*Navajo Nation v. New Mexico*,
    975 F.2d 741 (10th Cir. 1992) ...............................................................................10

*NIFLA v. Beccera*,
138 S. Ct. 2361 (2018) .................................................................25

*Norsworthy v. Beard*,
87 F. Supp. 3d 1104 (N.D. Cal. 2015) ...........................................11

*Obergefell v. Hodges*,
576 U.S. 644 (2015).................................................................8, 20

*Perry v. Sindermann*,
408 U.S. 593 (1972).......................................................................19

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009).......................................................................22

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999)...........................................................17

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989).........................................................................9

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) .......................4, 11, 12, 14, 17

*Romer v. Evans*,
517 U.S. 620 (1996)..................................................................12, 15

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008) ...............................................10

*Smith v. Avanti*,
249 F. Supp. 3d 1194 (D. Colo. 2017).............................................9

*Stewart v. City of Oklahoma City*,
-- F.4th --, 2022 WL 4084668 (10th Cir. 2022).......................16, 17

*Stidham v. Peace Officer Standards & Training*,
265 F.3d 1144 (10th Cir. 2001) ......................................................16

*Tudor v. SE Okla. State Univ.*,
13 F.4th 1019 (10th Cir. 2021) .........................................................7

*United States v. Virginia*,
518 U.S. 515 (1996).........................................................................4

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)..................................................................................15

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    135 S. Ct. 2239 (2015)........................................................................22, 23

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ..............................................................11

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012)...................................................................12

*Wooley v. Maynard*,
    430 U.S. 705 (1977)...............................................................................22

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020) .........................................................8, 13

**Statutes**

70 Okla. Stat. § 1-125 ....................................................................................15

63 Okla. Stat. § 1-131…………………………………………………………..3

63 Okla. Stat. § 1-311 ....................................................................................24

63 Okla. Stat. § 1-316 ....................................................................................22

63 Okla. Stat. § 1-321 ....................................................................................22

63 Okla. Stat. § 1-323 ...............................................................................18, 23

# <u>INTRODUCTION</u>

Defendants have stripped transgender people of legal recognition of their identity, in spite of the extraordinary danger inflicted by their actions, the absence of any harms in the many years preceding this policy reversal, and even the court orders forbidding their conduct. They fervently believe that "sex" must have their preferred meaning—one rooted in "Oklahoma values," as the Governor put it—and they have used the power of government to impose that view on the nonconforming minority whose identity and very existence threatens it.

The constitutional guarantees against abuse of government power that protect all of us do not permit Defendants to hold Plaintiffs' identity documents hostage to make a political point. Successful navigation of modern life requires accurate identification. From employment to housing, and health care to financial affairs, there are few facets of life where we are not called upon to prove our identities. But when Plaintiffs are called upon to do so, they cannot use their birth certificates—one of the most foundational documents to verify identity—as others are able to do. Instead, their certificates involuntarily disclose their transgender status, exposing them to an all-too-real risk of harassment, discrimination, and even catastrophic violence.

As virtually every federal and state court to confront the issue has held, the government may not bar transgender people from correcting their identity documents to match their gender identity. First, doing so violates equal protection: while others have access to birth certificates matching their gender identity, transgender people are deprived of access to such documents. That discriminates based on sex, regardless of how sex is defined, as well as transgender status. Second, the government violates due process through infringements upon the right to privacy, which protects against the involuntary disclosure of information revealing one's transgender status, and liberty, which safeguards the basic right to live in accordance with one's gender identity without

1

government intrusion. Third, the policy violates free speech by compelling transgender people like Plaintiffs to disclose information revealing their transgender status and, adding insult to injury, to carry the government's message of their gender rather than their own.

Ultimately, while the policy triggers heightened scrutiny on each of these bases, it fails even rational basis review. It is a quintessential solution in search of a problem. Tellingly, Defendants' imagined parade of horribles—including the incendiary and irrational assertion that women will suffer if transgender people's birth certificates are corrected—never came to pass in Oklahoma in the many years preceding its policy reversal, nor in the 47 states where transgender people can correct their birth certificates to match their gender identity. For all these reasons, Plaintiffs have satisfied and surpassed their burden at the pleading stage to state valid claims.

## FACTUAL BACKGROUND

Plaintiffs Rowan Fowler, Allister Hall, and C.R. are transgender Oklahomans who seek to correct their birth certificates to accurately reflect their sex, consistent with their gender identity. ECF No. 21, First Amd. Compl. ("FAC"), ¶ 11-13. Like other transgender people, the sex they were assigned at birth does not match their gender identity, which is a person's core internal sense of their own gender. *Id.* ¶ 20. Contrary to the government's derisive characterization, gender identity is not some new-fangled invention: it is an established concept in science, medicine, and law, and it is the key determinant of a person's sex, including most notably where one's gender identity differs from their birth-assigned sex. *Id.*

Like almost every other state in the country, Oklahoma previously allowed transgender people to correct their birth certificates to match their gender identity—but Defendants abruptly reversed that longstanding practice and replaced it with a categorical ban (hereafter, "Birth Certificate Policy" or "Policy"). *Id.* ¶ 50. On November 8, 2021, Governor Stitt issued an

2

Executive Order unilaterally decreeing that Oklahoma law does not provide the Oklahoma State Department of Health (OSDH) or others with the ability to "alter a person's sex or gender on a birth certificate."[1] *Id.* ¶ 55. Shortly before its issuance, he explained that, "I believe that people are created by God to be male or female. Period." *Id.* ¶ 53. He also promised that he would "tak[e] whatever action necessary to protect Oklahoma values." *Id.*

Notwithstanding Defendants' portrayal of the Policy as supposedly imposing a "neutral" rule on all people born in Oklahoma, the only change it accomplished was with respect to transgender people. Both before and after the Policy, non-transgender people have always had access to birth certificates matching their gender identity. But after the Policy, transgender people like Plaintiffs have been categorically deprived of such access.

**ARGUMENT**

**I.   Defendants' Birth Certificate Policy Violates the Equal Protection Clause.**

**A.   The Policy Triggers Heightened Scrutiny Because It Discriminates Based on Sex and Transgender Status.**

Defendants' Birth Certificate Policy strips transgender people like Plaintiffs of access to birth certificates that match their gender identity while Defendants continue to provide people who are not transgender with birth certificates that match their gender identity. That is discrimination, pure and simple, and it demands the rigors of heightened scrutiny on at least two independent grounds, as explained further below. First, the Policy discriminates based on sex. No matter how Defendants try to repackage their Policy—which literally engages in a sex-based classification of

---

[1] Defendants also assert that an Oklahoma statute now forbids alteration of a birth certificate sex designation "for any reason." But that is not what the statute says, and if its purpose was to ban transgender men and women like Plaintiffs from correcting their birth certificates to match their male and female gender identity, it would have said so. 63 Okla. Stat. § 1-131 (stating that birth certificate designations "shall be either male or female and shall not be nonbinary").

individuals—as somehow "neutral," it plainly engages in discrimination on its face. That is true even if "sex" is wrongly viewed as including only one's birth-assigned sex; but the Policy also discriminates in several other respects—including based on gender identity, sex stereotypes, and gender transition—all of which fall within the broad spectrum of ways in which sex-based discrimination can manifest itself. Second, the Policy also triggers heightened scrutiny because discrimination against transgender people bears all the indicia of a suspect classification. Transgender people have suffered a long, painful history of discrimination that persists today based on a characteristic unrelated to their value to society, and they lack the requisite political power necessary to shield themselves from these abuses.

Heightened scrutiny imposes a "stringent" standard: the policy at issue is presumed unconstitutional unless the government can satisfy its burden to demonstrate, at a minimum, that an exceedingly persuasive justification actually motivated its enactment. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 799 (10th Cir. 2019). Defendants cannot meet that heavy burden here, much less at the pleading stage. Nor can they shirk their burden entirely by claiming that the Policy is exempt from any scrutiny. *Compare* ECF No. 24 ("Mot.") 12 (conflating whether policies may ultimately *survive* heightened scrutiny with whether such scrutiny nonetheless attaches in the first place) *with United States v. Virginia*, 518 U.S. 515, 555 (1996) ("all gender-based classifications … warrant heightened scrutiny") (quotes omitted).

Notably, regardless of the precise level of scrutiny employed, or the specific right at issue, virtually every court in modern history has arrived at the same conclusion: governmental barriers that deny transgender people of identity documents matching their gender identity are unconstitutional. *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio 2020); *Foster v. Andersen*, No. 18-2552, ECF No. 33 (D. Kan. Jun. 21, 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131

4

(D. Idaho 2018); *Arroyo Gonzalez v. Rosello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018); *Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015); *see also Marquez v. Montana*, No. DV-21-873 (Yellowstone Cnty. Dist. Apr. 21, 2022);[2] *Corbitt v. Taylor*, 513 F. Supp. 3d 1309 (M.D. Ala. 2021); *D.T. v. Christ*, 552 F. Supp. 3d 888 (D. Ariz. 2021) *K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012). Indeed, as detailed below, the Policy cannot withstand even rational basis review.

### 1. The Policy Engages in Sex-Based Discrimination.

***Discrimination Based on Birth-Assigned Sex.*** The Policy discriminates based on sex in multiple ways. First, it plainly creates a sex-based classification on its face. Indeed, a policy that "cannot be stated without referencing sex" is perhaps the quintessential example of a sex-based classification. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (holding that a school policy that barred a transgender male from boys' facilities based on his "biological gender" discriminated on the basis of sex); *Kadel v. Folwell,* No. 1:19CV272, 2022 WL 3226731, at *18-20 (M.D.N.C. Aug. 10, 2022) (holding that an insurance policy excluding coverage for "sex changes" facially discriminated against transgender people); *Corbitt*, 513 F. Supp. 3d at 1315 (holding that a policy denying transgender plaintiffs of driver's licenses reflecting their gender identity absent surgery imposed the government's own "sex classification").

Here, Defendants' Policy cannot be stated without referencing sex. The Executive Order permanently consigns transgender people to the sex designation they were assigned at birth by forbidding OSDH officials from "'alter[ing] a person's sex or gender on a birth certificate.'" FAC ¶ 55. The complaint alleges that Governor Stitt and his office have "specifically instruct[ed]

---

[2] *Marquez* is available at https://www.aclumontana.org/sites/default/files/field_documents/ findings_of_fact_conclusions_of_law_and_order_granting_in_part_defendants_motion_to_dismi ss_and_granting_plaintiffs_motion_for_a_preliminary_injunction.pdf.

OSDH officials that they cannot correct the birth certificates of transgender people to reflect their male or female gender identity." *Id.* ¶ 56. And if there were any doubt that the Policy is based on sex, Defendants' position here erases it: "laws, like the birth certificate law at issue here … classify individuals based on biological or birth sex." Mot. 13. By Defendants' own admission, then, the Policy is not "neutral" with regard to sex. To the contrary, classifying individuals like Plaintiffs based on Defendants' view of "sex" is its central and defining feature.

Notably, the Policy necessarily engages in a sex-based classification regardless of how "sex" is defined. Even if sex were narrowly (and wrongly) construed to encompass only an individual's sex assigned at birth—or what Defendants call "biological sex," ignoring that gender identity itself has biological underpinnings, FAC ¶ 24—the Policy nonetheless discriminates on that basis. The Policy denies Ms. Fowler of a birth certificate matching her gender identity because she was assigned male at birth. Had she been assigned female at birth, she would have a certificate matching her identity, which she could use to participate in society like everyone else. Thus, her birth-assigned sex is an undeniable but-for cause of her injury. *Cf. Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020).

That was precisely the logic of the Supreme Court's holding in *Bostock v. Clayton Cnty*. 140 S. Ct. 1731 (2020). The Court expressly assumed—without deciding—that sex referred to nothing more than one's reproductive biology for the sake of argument; but it concluded that discrimination against a transgender person still necessarily turned on that person's birth-assigned sex. *Id.* at 1739. Thus, Defendants' invitation that this Court find that "sex" excludes gender identity—in defiance of all scientific and medical understanding to the contrary, FAC ¶¶ 17-37— is not only wrong as a matter of fact, and forbidden at the pleading stage, but it is also futile as a matter of law. Simply put, "it is impossible to discriminate against a person for being …

6

transgender without discriminating against that individual based on sex."[3] *Id.* at 1741.

Both before and after *Bostock*, courts have recognized that where the government denies transgender people of identity documents reflecting their gender identity, it has engaged in discrimination based on sex. *F.V.*, 286 F. Supp. 3d at 1144; *cf. Corbitt*, 513 F. Supp. 3d at 1315 ("the State sets the criteria by which it channels people into its sex classifications"); *D.T.*, 552 F. Supp. 3d at 895-96 (applying *Bostock* and recognizing that the state's birth certificate policy did not need to use the word "transgender" to engage in sex discrimination against transgender people, because it was logically inherent in the restriction at issue).

The Tenth Circuit recognized that it is "clear" that *Bostock* overruled its prior circuit authority wrongly suggesting that discrimination against transgender people is not necessarily discrimination because of sex—which "is no longer valid precedent." *Tudor v. SE Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) (holding that transgender professor was entitled to tenure and other relief). Defendants nonetheless attempt to resuscitate this overruled authority, and others like it, by arguing that there is no sex discrimination so long as "biological males" as a group are not exposed to disadvantageous terms relative to women. Mot. 14. But that argument is foreclosed by *Bostock*, which held that a defendant "cannot escape liability by demonstrating that it treats males and females comparably as groups." 140 S. Ct. at 1744.

The lynchpin of Defendants' equal protection argument—that, the government supposedly imposes a "neutral" rule because it treats everyone according to their birth-assigned sex—fails for the same reason: it seeks to obscure discrimination by arguing that such discrimination is

---

[3] *Bostock* also explained that "discrimination" requires *both* differential treatment *and* injury. 140 S. Ct. at 1739 (explaining that discrimination requires differences in treatment that cause injury). Thus, the fact that a non-transgender man receives a birth certificate designated male rather than female, for instance, does mean that he has suffered "discrimination," because he already possesses a birth certificate matching his gender identity and has not suffered injury.

"equally" applied to all. Mot. 8; *cf. Grimm*, 972 F.3d at 609 ("that is like saying that racially segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race"). By that reasoning, laws excluding same-sex couples from marriage never discriminated against gays and lesbians because they also precluded heterosexuals from marrying others of the same sex. Of course, *Obergefell v. Hodges,* 576 U.S. 644 (2015), concluded differently. Indeed, by Defendants' logic, no adverse action against transgender people would ever be discriminatory, because any defendant could always argue that it "neutrally" requires everyone to live in a manner consistent with their birth-assigned sex—which strikes directly against what it means to be transgender. In any event, Defendants' intent to target transgender people is apparent in light of the Policy's origin and purpose. FAC ¶¶ 52-56.

   ***Discrimination Based on Gender Identity, Sex Stereotypes, & Gender Transition.*** The Policy also discriminates based on a host of other sex-based considerations apart from birth-assigned sex, including gender identity, sex stereotypes, and gender transition. Defendants' assertion that sex reduces to nothing more than "the binary and biological nature of the two sexes," Mot. 13, is flatly contradicted by the scientific and medical understanding of what sex encompasses. FAC ¶¶ 17-24; *cf. Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020) (recognizing that most people are male or female but "some people are neither"). Although a person possesses multiple sex-related characteristics, including hormones, chromosomes, and reproductive organs, "gender identity is *the* critical determinant of a person's sex." FAC ¶ 20. Thus, "to conclude discrimination based on gender identity or transsexual status is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning." *F.V.*, 286 F. Supp. 3d at 1144. Contrary to Defendants' hyperbole, however, the relief sought here does not require destroying of every record of birth-assigned sex nor all sex

classifications.  Plaintiffs merely seek corrected copies of birth certificates reflecting who they are.

Defendants also rely heavily on the notion that supposed "biological differences" immunize sex discrimination from any scrutiny.  But the Tenth Circuit has made clear that any "physical differences" in relation to sex "[do not] resolve the constitutional question."  *Fort Collins*, 916 F.3d at 801.  As here, policies "supposedly based on 'reasonable considerations' may in fact reflect 'archaic and overbroad generalizations about gender.'"  *Id.* at 799.

Discrimination based on sex "is not only discrimination because of maleness and discrimination because of femaleness" but, rather, it includes "discrimination because of the properties or characteristics by which individuals may be classified as male or female."  *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016).  For instance, it is blackletter law that discrimination based on "sex" encompasses discrimination based on the failure to conform to sex stereotypes—not merely "biological sex."  Long ago, the Supreme Court recognized that it is discriminatory to insist that individuals match the sex stereotypes expected for them.  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (holding that employer discriminated against a woman deemed insufficiently feminine, even if the employer had no objection to women per se).

These stereotypes are also inherent in discrimination against transgender people.  *See, e.g.*, *Corbitt*, 513 F. Supp. 3d at 1315 (holding that transgender people were being channeled into the government's sex classification and "told who they are by the State"); *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc*., 884 F.3d 560, 576 (6th Cir. 2018) (recognizing that "stereotypical notions of how sexual organs and gender identity ought to align" are inherent in discrimination against transgender people); *Smith v. Avanti*, 249 F. Supp. 3d 1194, 1200-01 (D. Colo. 2017) (recognizing that discrimination against transgender people is based on sex stereotyping).

Defendants' Policy is unabashedly rooted in sex stereotypes.  It imposes the government's

view of what constitutes a "real" man, or a "real" woman, while also enforcing the expectation that transgender people should be content with the sex designated for them at birth. But as the Tenth Circuit has cautioned: "Any law premised on generalizations about 'the way women are'— or the way men are—will fail constitutional scrutiny because it serves no important governmental objective." *Fort Collins*, 916 F.3d at 801 (quotes partially omitted). Indeed, the Policy is based on Governor Stitt's personal, religious views regarding how "people are created by God to be male or female" and the "Oklahoma values" that he believed must be protected by "whatever action necessary"—even in defiance of court orders. FAC ¶ 53. Adherence to sex stereotypes was thus an essential element of his *justification* for the Policy, which ultimately dooms its constitutionality. *See Navajo Nation v. New Mexico*, 975 F.2d 741, 744 (10th Cir. 1992) (holding that, where present, invidiousness is fatal to constitutionality).

Finally, the Policy discriminates based on gender transition, which is also necessarily discrimination based on sex. *R.G. &. G.R. Harris Funeral Homes*, 884 F.3d at 575 ("discrimination 'because of sex' inherently includes discrimination against employees because of a change in their sex"); *Fabian*, 172 F. Supp. 3d at 527. By analogy, firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,'" even if the employer harbored no bias towards either Christians or Jews but only "converts." *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008). Similarly, by discriminating against those who seek to correct their gender markers to match their gender identity, the Policy necessarily discriminates on the basis of sex.

## 2. The Policy Discriminates Against Transgender People, Who Constitute a Suspect Class.

The Policy also independently requires heightened scrutiny because government discrimination against transgender people bears all the indicia of suspect classification.

Heightened scrutiny is required where the government targets a class that (1) has been historically subjected to discrimination, (2) has a defining characteristic frequently bearing no relation to one's ability to perform or contribute to society, (3) has obvious, immutable, or distinguishing characteristics, and (4) is a minority or politically vulnerable. *Karnoski v. Trump*, 926 F.3d 1180, 1200 n.17 (9th Cir. 2019) (quotes omitted). As a litany of federal appeals and district courts have recognized, all these indicia are present for transgender people.[4] FAC ¶ 129.

First, there has been a long and cruel history of discrimination against transgender people, which remains pervasive to this day. "There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Grimm*, 972 F.3d at 612; *Foster v. Andersen*, No. 18-2552, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019) (recognizing ongoing harms). Second, this longstanding discrimination is unrelated to transgender people's value to society. *Grimm*, 972 F.3d at 612; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139. Third, transgender people have an obvious, immutable, or distinguishing characteristic that defines them as a discrete group. *Grimm*, 972 F.3d at 612-13; *Ray*, 507 F. Supp. 3d at 937. Finally, "transgender people are unarguably a politically vulnerable minority." *F.V.*, 286 F. Supp. 3d at 1145; *Grimm*, 972 F.3d at 613. Because discrimination against transgender people rings every alarm alerting courts to a suspect or quasi-suspect classification,

---

[4] *See, e.g.*, *Karnoski*, 926 F.3d at 1200; *Grimm*, 972 F.3d at 610-13; *Ray*, 507 F. Supp. 3d at 937; *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719-22 (D. Md. 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 952-53 (W.D. Wis. 2018); *F.V.*, 286 F. Supp. 3d at 1144; *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016) ("*Highland*"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015). Defendants cannot overcome this litany of authority, much less by relying on cases whose underpinnings *Bostock* swept away.

the Policy here is subject to heightened scrutiny.

**B.      The Policy Fails Even Rational Basis Review.**

Although the Policy is subject to heightened scrutiny on multiple grounds (addressed both above and below), it fails even rational basis review.  Even in an ordinary case, rational basis review "is not toothless."  *Dalton v. Reynolds*, 2 F.4th 1300, 1309 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 348 (2021).  More importantly for purposes here, courts have routinely applied more searching rational basis review where the government has disadvantaged an unpopular group or burdened important liberty interests.  *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012); *see also Golinski v. U.S. Off. of Pers. Mgmt.*, 824 F. Supp. 2d 968, 996 (N.D. Cal. 2012).  In all events, the court must conduct an inquiry into "the relation between the classification adopted and the object to be attained."  *Romer v. Evans*, 517 U.S. 620, 632 (1996).

As noted above, a plethora of courts have recognized that policies barring transgender people from obtaining identity documents matching their gender identity lack any adequate government justification.  *See, e.g.*, *Ray*, 507 F. Supp. 3d at 939 (holding that the policy "[did] not even survive rational basis review because there is no logical connection between the Policy and proffered justifications").  And neither of the government's attempted justifications here— promoting accuracy and protecting women—pass minimum constitutional muster, particularly at the pleading stage where the court must accept the complaint's factual allegations as true.

***Promoting Accuracy***.   The assertion that the Policy promotes "accuracy" is a wholly circular justification:  Defendants claim that Plaintiffs' birth certificates are accurate because they reflect their sex assigned at birth.  But that merely restates what the Policy does—not *why* it is more accurate to saddle transgender people with identity documents that do not match their identity.  *Cf. Kitchen v. Herbert*, 755 F.3d 1193, 1216 (10th Cir. 2014) (rejecting as "wholly

circular" the government's assertion that same-sex couples cannot be recognized as spouses because they are purportedly excluded, by definition, from the institution of marriage).

The Policy does not promote any interest in accuracy and, in fact, thwarts that interest. FAC ¶ 48. As another federal court similarly recognized, the government's refusal to correct the gender markers on transgender people's driver's licenses "[bore] little, if any, connection to Defendant's purported interests" in maintaining accurate identity documents. *Love*, 146 F. Supp. 3d at 856. Other courts have recognized that policies similar to the one here undermine accuracy. *See, e.g.*, *K.L.*, 2012 WL 2685183, at *7 (holding that the refusal to correct a transgender woman's driver's license not only failed to "further[] … the state's interest in accurate document[s] and identification" but created a risk of "inaccurate and inconsistent identification documents"). An identity document bearing a transgender person's birth-assigned sex "inaccurately describe the discernable appearance of the [document] holder by not reflecting the holder's lived gender expression of identity," thus creating problems for both that person and others who see it. *Id.*; *Corbitt*, 513 F. Supp. 3d at 1323 (rejecting that "a sex designation that differs from the license-holder's appearance" would help in accurate identification); *F.V.*, 286 F. Supp. 3d at 1142 (birth certificate policy lacked rational basis); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333 (birth certificate policy was "not justified by any legitimate government interest").

Those problems are borne out in Plaintiffs' lives. *See, e.g.*, FAC ¶¶ 85-86, 116-19. Consigning a transgender woman who lives openly as a woman to an identity document labeling her as male only injects inaccuracy into situations where she presents that document to others. "A chef might label a jar of salt a jar of sugar, but the label does not make the salt any sweeter." *Zzymm*, 958 F.3d at 1024 (rejecting government justification based on accuracy in denying intersex plaintiff of passport with gender-neutral marker).

The absence of any rational connection is particularly pronounced here, because Oklahoma previously *allowed* transgender people to correct their birth certificates for more than a decade—without somehow jeopardizing the accuracy of vital records. FAC ¶ 50. Other states that have similarly flip-flopped on their policies have failed to persuade courts of imagined harms to the accuracy of vital records, which are plainly disproven by their past practice. *Ray*, 507 F. Supp. at 938 (rejecting Ohio's purported interest in the accuracy of records given that it previously permitted transgender people to change the sex marker on their birth certificates). More broadly, the accuracy of other states' vital records plainly has not come to a grinding halt, even though a whopping 47 states permit transgender people to correct their birth certificates to match their gender identity. FAC ¶ 58; *cf. Fort Collins*, 916 F.3d at 803. Defendants' insistence that the Policy is crucial to vital records accuracy thus has no "footing in the realities of the subject addressed by the [policy]." *Heller v. Doe*, 509 U.S. 312, 321 (1993).

The Policy also undermines accuracy by creating inconsistency across other identity documents for transgender people. In contrast to its birth certificate policy, Oklahoma allows transgender people to correct their driver's licenses to reflect their gender identity, thus leaving them with one document saying male and another document saying female, a potentially confounding situation that hardly aids in identity verification. FAC ¶¶ 60, 86. Likewise, the Policy can create similar inconsistency between transgender people's birth certificates and federal documents, such as their social security records and passports. FAC ¶¶ 75, 96, 111.

***Protecting Women.*** Defendants assert that the Policy is justified in the name of protecting women, but that itself betrays the sex-based stereotypes that motivated the Policy, and the Policy lacks any rational connection to the protection of women in any event.

Sex discrimination is often "rationalized by an attitude of 'romantic paternalism'" such as

the notion that "[m]an is, or should be, women's protector and defender" and that "[t]he natural and proper timidity and delicacy" of women must be preserved. *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) (quotes omitted). But that is not a legitimate government interest. Defendants' admission that the Policy—which applies to both transgender men and women—was nonetheless animated by a view that women, in particular, needed protection from transgender people correcting their birth certificates is itself a confession of sex discrimination.

In any event, the Policy also lacks any rational connection to the protection of women. Defendants never articulate how, precisely, allowing Ms. Fowler to correct her birth certificate, or allowing C.R. to correct his birth certificate, would harm any woman. Defendants never explain how women were somehow harmed during the decade-plus stretch of time when they permitted transgender people to correct their Oklahoma birth certificates. FAC ¶ 50. And Defendants never point to any harm to women in the scores of other states that allow transgender people to correct their birth certificates. *Id.* ¶ 58. Because these harms do not exist.

Defendants instead resort to stoking imagined, unsupported, and illogical fears, none of which can justify the Policy. *Cf. Fort Collins*, 916 F.3d at 803. For example, Defendants gesture vaguely towards restrooms and sports. Mot. 14. But monitors are not generally stationed outside restrooms inspecting birth certificates, nor does the relief sought here compel Defendants' reliance upon corrected birth certificates for such access or another purpose. *Cf.* 70 Okla. Stat. § 1-125 (relying on an "original" birth certificate in defining sex for access to facilities). At the same time, Oklahoma does allow transgender people to obtain state licenses reflecting their gender identity, undermining any interest in denying them all treatment consistent with their identity. FAC ¶ 60. The Policy is thus both vastly over-inclusive and under-inclusive with respect to any rational basis. *Cf. Romer*, 517 U.S. at 632; *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 536-37 (1973).

Ultimately, notwithstanding Defendants' hyperbole, this case is about birth certificates—and the specific justifications asserted by Defendants in defense of the Policy at issue—rather than other practices whose particular justifications are not at issue here.

## II.     The Policy Violates the Due Process Clause by Infringing Privacy and Liberty.

The Policy also requires heightened scrutiny under the Due Process Clause, both because it infringes Plaintiffs' right to informational privacy and Plaintiffs' rights to liberty, autonomy, and dignity.  Either basis independently triggers application of heightened scrutiny.

### A.     The Policy Violates Plaintiffs' Right to Informational Privacy.

Plaintiffs have alleged ample facts to show that the Policy impinges on their fundamental right to informational privacy.  It forces them to disclose that their assigned sex at birth does not match their gender identity—thus disclosing their transgender status (and related medical information)—every time they present their birth certificate to others.  That involuntary disclosure reveals intensely private information that places them in jeopardy for serious harm.  Defendants contend that the Tenth Circuit has never recognized a right to privacy; that the information at issue is not worthy of protection; and that the government has not caused any disclosure.  All of these arguments miss the mark.

First, as the Tenth Circuit recently confirmed in binding precedent, "[w]e have long held that the constitutional right to privacy prohibits the government from inquiring into or disclosing private information" that is shielded by the Constitution.  *Stewart v. City of Oklahoma City*, -- F.4th --, 2022 WL 4084668, at *7 (10th Cir. 2022) (quotes omitted); *see also Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1155 (10th Cir. 2001); *Herring v. Keenan,* 218 F.3d 1171, 1175 (10th Cir. 2000); *Eastwood v. Dep't of Corrs.*, 846 F.2d 627, 630-32 (10th Cir. 1988). And it has specifically rejected Defendants' contention that circuit precedent has departed from

this holding. *Stewart*, 2022 WL 4084668, at *7 n.8 (explaining that the qualified immunity case on which Defendants rely here "does not change our analysis").

Second, a person's transgender status is extraordinarily sensitive, personal, and private information that demands constitutional protection. Simply being transgender "is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). The Tenth Circuit agrees that "'[t]he excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate.'" *Anderson v. Blake*, 469 F.3d 910, 915 (10th Cir. 2006) (quoting *Powell*, 175 F.3d at 111). "Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, 'there are few areas which more closely intimate facts of a personal nature than one's transgender status.'" *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. Courts have thus held that policies relegating transgender people to identity documents that disclose their transgender status infringe upon their privacy. *See, e.g.*, *Ray*, 507 F. Supp. 3d at 931-32; *Arroyo Gonzalez*, 305 F. Supp. 3d at 333; *Love*, 146 F. Supp. 3d at 853-56.

Indeed, the involuntary disclosure of a person's transgender status—particularly in contexts where one would otherwise keep that information private—can place a person's physical safety and bodily integrity in jeopardy. *Ray*, 507 F. Supp. 3d at 934 (emphasizing the "heightened risk of harm transgender people face when forced to disclose"); *Powell*, 175 F.3d at 111. "A mismatch between the gender indicated on the document and the gender of the holder calls down discrimination." *Adkins*, 143 F. Supp. 3d at 139-40. There remains "a great deal of animosity" towards transgender people, as confirmed by a "plethora" of evidence—including disturbing hate crimes statistics. *Love*, 146 F. Supp. 3d at 855-56. Plaintiffs' own life experiences confirm that these threats are all too real. *See, e.g.*, FAC ¶¶ 79-82, 98, 116.

Defendants rely heavily on *Leiser v. Moore*, 903 F.3d 1137 (10th Cir. 2018), but it only confirms that, whatever the boundaries of a right of informational privacy in more marginal cases, it plainly protects the involuntary disclosure of a person's transgender status. The Tenth Circuit specifically contrasted the facts in that case (involving disclosure of a cancer diagnosis to elicit support from family and friends), which it found insufficient to overcome a qualified immunity defense for damages, with other disclosures—such as "a person's HIV status and transsexualism"—which would bring about "public opprobrium [or] expose a person to discrimination and intolerance." *Id.* at 1145 (quotes omitted). Indeed, the court's juxtaposition indicates that it viewed the latter as conscience-shocking disclosures. *Id.* at 1144; *cf. Grimes v. County of Cook*, 455 F. Supp. 3d 630, 639 (N.D. Ill. 2020) (independent grounds for liability).

Third, Defendants cannot wash their hands of responsibility by pointing the finger at transgender people and blaming them for the injuries that Defendants have caused. The mere fact that Governor Stitt, for instance, has not personally presented Ms. Fowler's birth certificates to third parties is no defense to liability. *Botello v. Morgan Hill Unified Sch. Dist.*, No. C09-02121 HRL, 2009 WL 3918930, at *4 (N.D. Cal. Nov. 18, 2009) (recognizing privacy "is not limited to the state's disclosure of personal information—it also includes a plaintiff's compelled disclosure of personal information"). Defendants bear responsibility for the intended consequences of the Policy they have created and enforced. *Cf. K.L.*, 2012 WL 2685183, at *6 (recognizing that the government did not directly disclose party's transgender status but that its driver's license policy nonetheless caused the privacy violations); *Love*, 146 F. Supp. 3d at 856. Notably, the government does not maintain birth certificates simply to file them away in a cabinet; it provides people with copies of their own birth certificates so they can be used. 63 Okla. Stat. § 1-323(A)(1). The disclosure of one's birth certificate to others is thus not merely foreseeable but, in fact, is part of

the reason why the government provides copies of birth certificates in the first place. FAC ¶ 39.

Defendants also cannot escape liability by blaming Plaintiffs for living in accordance with their gender identity—which they have a constitutional right to do. Mot. 20 (suggesting that transgender people's "statements, mannerisms, or appearance" are to blame for disclosure). By that logic, virtually any outing of a transgender person could be excused as something they brought on themselves. But the Policy undeniably causes privacy violations that would not otherwise exist, because the display of a gender marker on a birth certificate that is discordant with one's gender identity reveals to others that the birth certificate holder is transgender.

Finally, it is no answer to suggest that transgender people can simply never present their birth certificates to others, particularly when non-transgender people are able to do so freely. People must produce birth certificates to participate fully in public life. FAC ¶ 40. The government cannot coerce people to choose between a valuable benefit and a constitutionally protected right. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *accord Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). In other words, the government may not accomplish indirectly that which it could not accomplish directly.

### B. The Policy Burdens Plaintiffs' Rights to Liberty, Autonomy, and Dignity.

The Policy also triggers heightened scrutiny because the government has stripped transgender people of their prior ability to define, express, and live in accordance with their gender identity and instead foisted the government's view of their sex onto them in its place. It is one thing for Governor Stitt to personally "believe that people are created by God to be male or female"—but it is an entirely different matter to impose his view of sex onto others, with the power of government at his back. FAC ¶ 53. This intrusion into Plaintiffs' personal lives invades a constitutionally sheltered sphere of individual liberty, autonomy, and dignity.

"The Constitution promises liberty to all within its reach," including the right "to define and express their identity." *Obergefell*, 576 U.S. at 651-52. Protected liberty interests are those that implicate "individual dignity and autonomy" and include actions that "shape an individual's destiny." *Id.* at 645, 663. They serve as a foundation for other liberties. A person's core internal sense of their own gender, and what that means for their everyday life, is profoundly central to their personal identity. "The right to identify our own existence lies at the heart of one's humanity." *Arroyo Gonzalez,* 305 F. Supp. 3d at 334 (holding that the denial of accurate birth certificates to transgender people violates the "autonomy branch" of constitutional protection).

Transgender people possess this liberty in equal measure with everyone else. "And so, we must heed their voices: 'the woman that I am,' 'the man that I am.'" *Id.* Otherwise, "new groups could not invoke rights once denied," and states could continue to bar same-sex or interracial couples from marriage, for example. *Obergefell*, 576 U.S. at 671. Our founders "did not presume to know the extent of freedom in all its dimensions, and so they entrusted to future generations a charter protecting the right of all persons." *Id.* at 664. The Tenth Circuit has similarly instructed that "in describing the liberty interest at stake, it is impermissible to focus on the identity or class-membership of the individual exercising the right." *Kitchen*, 755 F.3d at 1215.

Whenever the government has placed sex at issue, it has historically treated non-transgender people in a manner consistent with their gender identity. Indeed, Defendants themselves confirm a history of doing so—contrary to their arguments elsewhere based on *Dobbs* professing the absence of any history in support of the liberty interest here. Mot. 2 (describing recording of vital statistics, including sex, as "pre-dating the American Revolution"). The fact that the government has not consistently afforded that same treatment to transgender people does not divest them of their right to equal dignity. *See Kitchen*, 755 F.3d at 1215.

While all individuals have a right to be treated consistent with their gender identity, the liberty infringement at issue here is also magnified because it intrudes into Plaintiffs' medical autonomy. *Cf. D.T.*, 552 F. Supp. 3d at 895 (holding that transgender plaintiffs who were denied birth certificates matching their gender identity absent surgical treatment had cognizable claim under the Due Process Clause, which protects both the right to define and express one's identity and choices about medical treatment); *Marquez*, *supra*; *see also Eknes-Tucker v. Marshall*, -- F. Supp. 3d --, 2022 WL 1521889, at *7-9 (M.D. Ala. 2022). The ability to live in accordance with one's gender identity in all aspects of life is essential to treating gender dysphoria and averting its otherwise devastating consequences. FAC ¶¶ 17-37, 135, 138. If liberty has any meaning at all, it protects against government officials dictating the terms of our personal identity.

## III. The Policy Violates Transgender People's First Amendment Rights to Free Speech.

Defendants ask this Court to dismiss Plaintiffs' First Amendment claim because the speech at issue, they contend, belongs to the government, not to Plaintiffs. But birth certificates are considered "identity documents" for a reason: they reflect the individual identity of the document holder. And the gender marker displayed on an individual's birth certificate expresses intimate information relating to that particular individual. By forcing transgender Oklahomans to maintain and produce birth certificates containing the state's ideological message about their gender, rather than their own truthful message, Oklahoma unconstitutionally compels their speech. Defendants' attempts to recast this as "government speech" are wholly without merit.

### A. Gender Markers on Birth Certificates Do Not Constitute Government Speech Because They Are Attributed to the Individual, Not the Government.

Defendants fundamentally mischaracterize the purpose and utility of birth certificates, inaccurately asserting that birth certificates merely record "factual information" at the time of a person's birth and function as a permanent legal record. Mot. 1, 22. Oklahoma's own laws

demonstrate that birth certificates are not immutable records of circumstances at a single point in time.  *See, e.g.*, 63 Okla. Stat. §§ 1-316 (providing for new birth certificates upon adoption, annulment of adoption, and establishment of paternity), 1-321 (allowing for amendments after name changes, acknowledgments of paternity, and court orders adjudicating paternity).  Rather, birth certificates are contemporaneous identification documents that people are routinely expected to present to others to participate fully in society, including when obtaining a passport, a driver's license, a social security card, or a voter registration card.  FAC ¶¶ 2, 40.

"The First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2253 (2015).  Although the State is generally entitled to its own viewpoints, it may not force a private party to be an instrument for "fostering public adherence to an ideological point of view he finds unacceptable." *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (quotes omitted).  Moreover, the State's interest in expressing a viewpoint "cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977).  The Tenth Circuit has elaborated on this principle, holding that individuals become couriers of the State's viewpoint when they are so "closely linked with the expression in a way that it makes [them] appear to endorse the government's message." *Cressman*, 798 F.3d at 949.

Here, birth certificates and the information shown on them are reasonably understood to reflect personal information relating to the particular individual.[5] *Pleasant Grove City, Utah v.*

---

[5] Defendants concede that a birth certificate conveys information concerning an individual and that it is disclosed by that individual to third parties for identification purposes.  Mot. 3, 19. Defendants cannot have it both ways, alleging Plaintiffs' privacy claim fails because disclosure is not attributable to the State, and then simultaneously alleging birth certificates are government speech that cannot be attributed to the Plaintiffs.

*Summum*, 555 U.S. 460, 471 (2009).  Identity documents answer a fundamental question:  who are you?  When an employee at a clerk's window is presented with an identity document stating the individual on the other side of the window is "male," it requires no great leap for that employee to assume the individual is communicating that he is male.  At the very least, whether a recipient of a birth certificate would attribute the gender marker to its presenter or to the government is a question of fact that precludes dismissal.[6]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The primary speech case on which Defendants rely is readily distinguishable.  In *Walker*, the Supreme Court held that Texas's specialty license plates constituted government speech because license plates had long been used by states to broadcast messages and mottos, and they "are often closely identified in the public mind" with the state.  135 S. Ct. at 2248-50.

Birth certificates, on the other hand, have not historically or typically been used by state governments to broadcast messages.  Birth certificates contain personal identifying information, and are kept confidential except in strictly limited cases, *see* 63 Okla. Stat § 1-323, and therefore do not serve the purpose of broadcasting government viewpoints.  Moreover, the Supreme Court has regarded the *Walker* decision as "the outer bounds of the government speech doctrine" and has instructed lower courts to "exercise great caution before extending … government-speech precedents" because the doctrine "is susceptible to dangerous misuse."  *Matal v. Tam*, 137 S. Ct. 1744, 1758-60 (2017).

Defendants also wrongly assume that because birth certificates are government records, registered with the state, and include the state's name that they are government speech.  Mot. 22.  But that logic has been flatly rejected by the Supreme Court.  In *Matal*, the Supreme Court held

---

[6] Plaintiffs also object to Defendants' improper attempt to use materials outside the pleadings, although the fact that a birth certificate indicates that the State of Oklahoma created the form into which information is then inserted is neither surprising nor particularly helpful to Defendants.

that the registration of trademarks with the U.S. Patent and Trademark Office did not per se "convert[] the mark[s] into government speech." 137 S. Ct. at 1748. To hold otherwise, the Supreme Court explained, "would constitute a huge and dangerous extension of the government-speech doctrine, for other systems of government registration could easily be characterized in the same way." *Id.* Moreover, the Court affirmed the lower court's ruling, which expressly characterized birth certificates as private speech. *In re Tam*, 808 F.3d 1321, 1348 (Fed. Cir. 2015) ("The PTO's processing of trademark registrations no more transforms private speech into government speech than when the government … records … birth certificates[.] To conclude otherwise would … allow rampant viewpoint discrimination.").

Finally, the Supreme Court has made clear that application of the government speech doctrine turns on the extent to which the government controls the content—not just the medium— of the speech at issue. *See Matal*, 137 S. Ct. at 1760. When contrasted against the specialty license plates in *Walker*, birth certificates are more akin to the trademark registrations in *Matal* because their actual content is independently supplied by private parties and then registered with the government. *See* 63 Okla. Stat. § 1-311. The State, for example, does not decide a person's name, nor does the State have authority to unilaterally determine a person's parentage or even their sex. Because registration does not convert otherwise private speech into government speech, and because the State does not control the content of birth certificates, the gender markers contained on Oklahoma's birth certificates do not constitute government speech.

**B.** **The Policy Compels Plaintiffs to Endorse the State's Message About Their Gender and Prohibits Them From Conveying Their Own Protected Message.**

The Supreme Court has repeatedly struck down laws forcing individuals to express a viewpoint with which they disagree. *See Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) ("Forcing free and independent individuals to endorse ideas they find

24

objectionable is always demeaning."); *see also Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). Notably, the government also may not force individuals to disclose unwanted facts any more than forcing them to disclose unwanted viewpoints. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004). Here, Defendants compel transgender people to use birth certificates that convey Defendants' viewpoint about their gender. Their Policy represents a particular ideology: that a person's gender should be based exclusively on the sex associated with their external genitalia at birth. While the State may choose to embrace that position, at least as a First Amendment matter, Plaintiffs cannot be made to endorse the State's message by being forced to communicate it to others. As the Supreme Court has affirmed, "the people lose when the government is the one deciding which ideas should prevail." *NIFLA v. Beccera*, 138 S. Ct. 2361, 2375 (2018).

Even as the Policy forces transgender people to endorse Defendants' viewpoint concerning the meaning of sex, it simultaneously prohibits Plaintiffs from conveying their own constitutionally-protected message about their identity and gender. *See, e.g.*, *Doe v. Bell*, 754 N.Y.S.2d 846, 851 (Sup. Ct. 2003). The Policy forces transgender people to contradict what lies at the very core of their personal identity and their beliefs. And the unconstitutionality of forcing this speech is underscored because only transgender people are targeted by this content-based restriction on their speech. Non-transgender people are not similarly compelled, because their birth certificates match who they are, and do not convey a message with which they disagree. It is a clear sign of content-based compelled speech when "'the State has left unburdened those speakers whose messages are in accord with its own views.'" *NIFLA*, 138 S. Ct. at 2378.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in full.

DATED: September 30, 2022

Respectfully submitted,

/s/ Shelly L. Skeen
Shelly L. Skeen*
Nicholas Guillory*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
3500 Oak Lawn Ave, Ste. 500
Dallas, TX 75219
Telephone: (214) 219-8585
Fax: (214) 481-9140
sskeen@lambdalegal.org
nguillory@lambdalegal.org

Peter C. Renn*
Christina S. Paek*
LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.
4221 Wilshire Boulevard, Ste. 280
Los Angeles, CA 90010
Telephone: (213) 382-7600
Fax: (213) 402-2537
prenn@lambdalegal.org
cpaek@lambdalegal.org

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*

Karen Keith Wilkins, OBA# 21005
1515 S. Denver Ave.
Tulsa, OK 74119
Telephone: (918) 599-8118
Fax: (918) 599-8119
karen@wilkinslawtulsa.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 30, 2022, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to all ECF registrants, including Defendants Kevin Stitt, Keith Reed, and Kelly Baker.

/s/ Shelly L. Skeen
Shelly L. Skeen
